**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 8, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

ROCKY DALE SNOW,

       Petitioner-Appellant,

v.

MARTY SIRMONS, Warden,
Oklahoma State Penitentiary,

       Respondent-Appellee.

No. 02-7027

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. CIV-00-70-S)**

Kristi Christopher, Assistant Federal Public Defender, Oklahoma City, Oklahoma,
for Petitioner-Appellant.

Preston Draper, Assistant Attorney General, State of Oklahoma (W.A. Drew
Edmondson, Attorney General, and Seth S. Branham, Assistant Attorney General,
State of Oklahoma, on the briefs), Oklahoma City, Oklahoma, for Respondent-
Appellee.

Before **HENRY**, **SEYMOUR**, and **EBEL**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Rocky Dale Snow seeks federal habeas relief pursuant to 28 U.S.C. § 2254 to challenge his Oklahoma state court conviction and sentence for unauthorized use of a motor vehicle, assault and battery with a deadly weapon, and murder in the first degree. He claims he received ineffective assistance of trial and appellate counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), and that the state suppressed exculpatory and material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied relief and Rocky appeals.[1] Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, we affirm.

## I

Rocky filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). We are therefore bound by

---

[1]Normally, we would refer to petitioner/defendant as Mr. Snow and all other witnesses or relevant individuals in the case by their last name. But nearly forty individuals testified at trial, and a number of additional affidavits were proffered in the course of the appeal and post-conviction litigation in this action. A number of these witnesses or affiants are related, many have the same last name, and many share similar first names. As we note later in the opinion, these similarities have caused occasional moments of confusion in the state appellate and federal district courts. In our attempt to avoid this confusion, we will refer to petitioner/defendant as Rocky. All other individuals will be introduced by their full names. Thereafter, we will refer to Rocky's family members who share the last name of Snow by their first names. All other family members or witnesses will be identified by their last name only.

the provisions of that statute. *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001). Pursuant to AEDPA, our review of Rocky's claims for relief is determined by how those issues were addressed by the state courts. *LeFevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999).

Where the state court has addressed a petitioner's claims on the merits, habeas relief will only be granted where the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The Supreme Court noted that when Congress drafted this portion of the statute, it

> specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Williams v. Taylor*, 529 U.S. 362, 411 (2000). We are thus precluded from granting habeas relief where we conclude the state court was merely erroneous or incorrect in its application of federal law. Rather, we may grant relief only when we are convinced the state court's application of federal law goes beyond being erroneous and instead becomes objectively unreasonable. *McLuckie v. Abbott*,

-3-

337 F.3d 1193, 1197 (10th Cir. 2003). This standard does not require our "abject deference," *id.* at 1202 n.5, but nonetheless prohibits us from substituting our "own judgment for that of the state court." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). In addition, factual findings made by the state court are presumed to be correct unless rebutted by the petitioner with clear and convincing evidence. *Smith v. Mullin*, 379 F.3d 919, 925 (10th Cir. 2004).

"To the extent that the state court has not addressed the merits of a claim and 'the federal district court made its own determination in the first instance,' this court reviews 'the district court's conclusions of law de novo and its findings of fact, if any, for clear error.'" *Cannon v. Gibson*, 259 F.3d 1253, 1260 (10th Cir. 2001) (quoting *LeFevers*, 182 F.3d at 711). "If the district court's factual findings depend entirely on the state court record, we independently review that record." *Allen v. Mullin*, 368 F.3d 1220, 1234 (10th Cir. 2004) (citations omitted).

AEDPA also governs Rocky's ability to obtain a remand to the district court for an evidentiary hearing on his claims. Section 2254(e)(2) of the statute provides that

> *[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings*, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that– (A) the claim relies on– (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been

-4-

previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added). Section 2254(e)(2) does not apply, however, where a petitioner has diligently sought to develop the factual basis underlying his habeas petition. A petitioner is diligent when he requests an evidentiary hearing and presents evidence "that would be readily available if the claim were true," *Cannon v. Mullin*, 383 F.3d 1152, 1177 (10th Cir. 2004), but his request is nonetheless denied, *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998). In such settings, an evidentiary hearing is warranted so long as the petitioner's "allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." *Id.* With these standards in mind, we turn to the facts presented at Rocky's trial.

## II

Rocky's case was tried to a jury over a five-day period. The evidence presented at trial indicated that around 10:30 a.m. on December 8, 1988, a young man entered the office of the 12th Street Flea Market in Ada, Oklahoma. Betty Bush ran the flea market and was in the office that morning along with Richard Newland and Wayne Russell.

The young man had "a full head of . . . blondish . . . light brown hair," which "seemed to be a little fluffed up or disheveled . . . by the wind that day." Tr. at 304, 422.[2] According to Newland, the man was wearing jeans and a gray or dark blue t-shirt. He was a "comparatively young man . . . [and] was probably near six feet tall." *Id.* at 304. Newland speculated the man weighed between 170 to 175 pounds. The man seemed to be in a hurry and "kind of held his neck like maybe he had a crick in [it]" over to the right side. *Id.* at 307.

Russell testified the man was wearing a "gray-hooded, zip-up-the-front sweatshirt, faded blue jeans, [and] a dark shirt. He was roughly 5'11", 6', [and] weighed about a hundred and seventy-five to eighty pounds." *Id.* at 422, 433. Russell also commented that the man's "eyes had a weird look to them," *id.* at 423, and that "when he came into the office, he had his head tilted way back." *Id.*[3]

---

[2]The record on appeal is extensive. It includes the entire transcript from Rocky's trial and related filings and documents; the expanded record from his direct appeal; the record from his state court post-conviction filings; and the record in his federal habeas corpus action. Citations to the trial record will appear as "Tr. at ___." State court preliminary hearing proceedings will appear as "Prelim. Hearing, date, at ___." Citations to the direct appeal record will appear as "Dir. App., rec. at ___." Citations to the state post-conviction record will appear as "State PC, rec. at ___." Citations to the federal record will appear as "Fed. HC, rec., vol. ___, doc. ___, item ___." Finally, citations to the parties briefs or petitions will indicate whether the brief is from the direct appeal (e.g., Dir. App., Aplt. Br. at ___), state post-conviction proceeding (State PC Pet., date, at ___), or federal appeal briefs (Fed. HC, Aplt. Br. at ___).

[3]Russell commented that "the man . . . had his eyes distorted to where it would disguise his features." Tr. at 435. However, it was not until late

(continued...)

The young man asked Bush if he could see some bedding. [*Id.* at 307.] She left the office and led the man in the direction of the flea market storage unit containing mattresses and bedding. A few minutes later, the man returned to the office in what appeared to be a slightly agitated state and asked Newland for further assistance. Newland left the office, and the young man followed him to the bedding unit. As Newland entered the unit, the man grabbed his shoulder, started to turn him around, and began to strike him with a knife. Newland suffered blows to his head, forehead, neck, and left hand. Newland testified that his orientation to the assailant was somewhere between "profile[] and face-to-face." *Id.* at 335. For a brief period of time during the assault, he was "nose-to-nose with the man." *Id.* at 337. Newland commented while hospitalized and recovering from his wounds that he would "never forget that face." *Id.*

After stabbing Newland several times, the assailant ran out of the storage

_____

[3](...continued)
December that Russell specifically remembered the nature of this distortion, which he described as

> a little trick with the eyelids that I hadn't seen since I was in junior high school, . . . where [kids would] reach up and grab their eyelid and fold the top part down to where it would hang down about a quarter of an inch below the eyelashes. Then they would release it, and it would just remain hanging like that. It would give a very weird, kind of wild look. And to be able to see, they'd have to tilt their head way back and look under that part of their eyelid that was hanging down below the eyelash . . . .

*Id.* at 436, 462.

unit. Newland did not immediately see Bush and feared she was also injured. He was bleeding profusely and was afraid he might lose consciousness, so he returned to the office and asked Russell to call the police for help. The police logged their receipt of the flea market call at 10:47 a.m., and they arrived at the scene almost immediately along with emergency medical personnel.

Bush was found wedged between a mattress and box springs in the storage unit. She had suffered stab wounds to her head, face, chest, back, and right arm. The top pocket of her coat was ripped, and loose change was found on the ground around her. Medical personnel were able to stabilize her temporarily, but soon thereafter she died from her wounds. Newland was hospitalized for about five days. The weapon was never found, but a medical examiner determined it was a single-edged knife, about one half-inch wide and at least three inches long.

Sometime after 10 a.m. that morning, Houston Owens, who worked at an establishment across the street from the flea market, observed a man drive up to the flea market and park a faded or dull red Chevrolet pickup. The man was wearing a gray hooded sweatshirt. Owens watched the man walk to the south end of the flea market building and disappear. About fifteen to twenty minutes later, the man returned, jumped into the truck and drove away in a hurry.

That same morning, Jerry Breeden, a mechanic who had a shop near the flea market, heard a truck speeding down the street. He went outside to observe

the vehicle and saw a "reddish-brown Chevrolet pickup heading south, running stop signs as it was going." *Id.* at 548. Owens testified to observing the same. After being shown a photograph of a J.B. Stallings Construction Company (Stallings) truck, Breeden identified the vehicle he saw as the truck in the photograph. Owens also eventually identified the vehicle as the Stallings truck. The truck's southernly route meant it was traveling away from, rather than toward, the Stallings work yard located in Ada.

Around noon that same day, employees at the Stallings work yard in Ada noticed that one of the trucks from the work fleet was missing. The truck was described as burnt orange or dull red in color and was last seen at the Ada location earlier that morning. The company only had one vehicle this color. The morning following the flea market crimes, the truck was found by Stallings employees at the company's Hartshorne, Oklahoma location.[4]

At trial, the state's theory was that Rocky took the Stallings truck from the Ada work yard, drove to the flea market, and in the course of robbing Bush, murdered her and stabbed Newland. The state further contended Rocky drove the truck to the Stallings location in Hartshorne. In supporting this theory, the state

---

[4]Hartshorne is located about seventy-six miles east of Ada. McAlester, another Oklahoma town relevant to the facts of this case, is between Ada and Hartshorne. It is sixty miles east of Ada and about fifteen miles west of Hartshorne.

presented twenty-nine witnesses, three rebuttal witnesses, and a variety of exhibits.  The defense attempted to shift suspicion for the murder and assault from Rocky to his older brother, Allen.  Rocky took the stand in his own defense and his counsel presented ten additional witnesses to bolster the defense case and cast suspicion on Allen.  In response, Allen flatly denied killing Bush or assaulting Newland.  He also denied bearing a resemblance to the composite image created by the police of the assailant.

A central component of the state's case was based on Newland and Russell's eye witness identifications of Rocky.  The day after the murder and assault, both men individually met with Harvey Pratt, a police artist, to create a composite image.  Pratt explained that

> as a police artist, in interviewing a witness or a victim to a crime, I go through a verbal description with the witness.  By that, I ask a series of questions regarding physical characteristics, mannerisms, and speech patterns.  After we go through a written description, I show the witness or the victims an Identification Kit, which is a small booklet comprised of facial characteristics.
>      . . . As we go through the [kit], I'll ask the witness or victim to pick out the pair of eyes or lips or nose that comes the closest.
>      As they pick out the different categories, I view them, and at that time, I am making a drawing . . . .
>      And as I make the this drawing, and I complete all the components of the facial characteristics, I . . . show the drawing to the witness and ask them to make any changes . . . . And we'll go through the series again . . . – once we've got everything as close as they can get, then we will quit.
>      Now, the drawing is not a positive identification.  I also advise the witnesses that.  The drawing is a look-a-like, similarities.  They are not positive or portrait quality.  They're a sketch.

*Id.* at 881-82. Pratt also acknowledged he has a "descriptive data sheet," *id.* at 880, that he goes over with the witnesses, and he specifically asks about scars. He affirmed that if he were told about a scar, he would include it in a composite drawing.

Pratt went through this process with both Newland and Russell. After reviewing the completed image, Newland suggested that the face be drawn to look a bit longer and that the hair needed to be changed. According to Newland, in the initial composite, the hair "looked close to the head, fairly close to the head, not fluffy, not bushy." *Id.* at 340. Russell was never fully satisfied with the image because it did not capture the unusual appearance of the assailant's eyes. Neither man mentioned whether the assailant had any scars or distinguishing marks. The composite image was posted in Ada, and soon thereafter Barbara Duncan, a woman who casually knew Rocky through his girlfriend, Marcia Cross, informed the police she thought Rocky bore a resemblance to the composite image. Rocky was subsequently arrested as a suspect for the December 8 crimes and charged with unauthorized use of a motor vehicle. As discussed in more detail below, Rocky admitted to driving the Stallings truck from Ada to Hartshorne.

On December 13, five days after the crimes, police conducted a six-man line-up. Rocky and five men enrolled at East Central University in Ada, Oklahoma comprised the line-up. Prior to the line-up, Rocky's court-appointed

attorney, Jess Green, unsuccessfully objected to its construction, asserting Allen should have been included. Counsel also insisted Rocky be allowed to tidy his hair so that it would have a groomed appearance more like that of the other men in the line-up. As Green testified at trial, prior to the line-up Rocky's hair was messy and looked like he had been sleeping. Green was concerned Rocky's mussed hair would make him stand out in the line-up. Consequently he had Rocky wet down his hair, dry it and groom it. It was dry for the line-up. Counsel was also concerned that the scar over Rocky's left eyebrow would be a distinguishing feature.[5] In response to this concern, the police required the members of the line-up to put a small band-aid over their left eyebrow.

The police conducted two separate line-ups, one for Newland and the other for Russell. Both line-ups were videotaped and later viewed by the jury at trial. Rocky was the fourth man in the line-up. Neither Newland nor Russell picked Rocky as the flea market assailant. Instead, they both independently picked the sixth man in the line-up, Richard Markum, who was at home with his wife on the morning of December 8. Jeff Crosby, the officer who videotaped the line-ups, testified it was quite unusual for two witnesses to pick out the same individual

---

[5]Dr. John Huneke testified at trial that he treated Rocky in May 1988 for a serious cut over his left eye. The doctor stated that the wound "had to be surgically repaired," Tr. at 786, and the injury was likely to leave a permanent scar. The doctor further testified that the scar would have been more obvious in December 1988 than during the trial, which occurred in June 1989.

from a line-up when that individual was not the suspected perpetrator.

At trial, Newland testified that he was asked to select the man who most closely resembled the man at the flea market, and he understood he could pick only one man. He said that following the line-up the officers informed him he "had made the wrong choice. That is, [he] had not picked the Defendant." *Id.* at 324. Newland further stated that while he had picked the sixth man out of the line-up, he had "privately . . . made a second selection," *id.* at 328, which was Rocky.

Green testified that as Newland was viewing the line-up, he pointed to the sixth man, Markum, and stated "[t]hat's the one that looks the most like him, to my recollection." *Id.* at 801. Gary Rodgers, a lead investigator in the case who was present at the line-up, also said Newland told him that number six "appeared to be similar from what he could recall the suspect appearing on the date that the incident occurred. And he indicated that number four [Rocky] – there was just something about number four, that his eyes just didn't seem right for some reason . . . ." *Id.* at 527-28.

Russell testified he understood he "was supposed to pick out the man who most clearly at the time resembled the man at the flea market." *Id.* at 436. According to Crosby, Russell stated the sixth man in the line-up, Markum, looked the most like the man he saw in the flea market on December 8. During the line-

up, Russell asked the fourth man, Rocky, to come forward to the line-up window so he could take a closer look at him. Because Russell remembered that "the man at the flea market had had his eyes distorted to where it would disguise his features, [he] wanted to see if [he] could get this distortion . . . with the man who was number four in the line-up." *Id.* at 435. According to Green, Russell asked the police to "be sure and make [Rocky] look up." *Id.* at 802. Others observing the line-up, however, testified Rocky never completely looked up or widened his eyes as he was directed by the police. Russell indicated he might have picked Rocky, except "his eyes [were not] right." *Id.* at 504.

Russell was also aware after the line-up that he had not made the right choice because the man he picked was not "the man that had been" at the flea market. *Id.* at 439. Although he chose Markum, he told the police Markum "more nearly resembles the one at the flea market, but this is not the person who did it." *Id.* at 457. Russell returned to the police station the day after the line-up to inquire if there was anything else he needed to do to help in the investigation. He bumped into Crosby and stated he understood he picked the wrong man. Crosby responded "you know, that's not the person we were suspecting." *Id.* at 505.

In the days following the unsuccessful line-up, the Ada Evening News ran a number of articles regarding the flea market crimes. On December 14, an article

-14-

stated that Rocky had been arrested and assault and murder charges were pending. It further stated Rocky had been part of a line-up, but had not been identified. The following day, an additional article noted that Newland and Russell picked a different man out of the line-up.[6] The next day, Russell called the police and indicated he had selected the wrong man in the line-up and that Rocky was the man he had seen at the flea market. He told the police he "had made the wrong choice, and [he] . . . wasn't convinced who was the guilty party" from the line-up. Tr. at 440.

On February 28, 1989, a preliminary hearing was held regarding the unauthorized vehicle use charge against Rocky, the sole charge then pending. The state's first witness, Newland, thought he was appearing at the hearing to testify on the assault and murder charges. Rocky was still represented by Green, who objected to Newland testifying. Counsel's objection was overruled when the state explained that "Mr. Newland was at his place of business, and subsequent witnesses will identify the pickup leaving the scene there . . . ." Prelim. Hearing, Feb. 28, 1989, at 6. Rocky was present at the hearing, wearing prison garb but

---

[6]The federal habeas record reflects that the paper reported the assistant district attorney "accused Snow of attempting to conceal his identity during the line-up and requested more time to prepare charges in the case." Fed. HC, rec., vol. III, doc. 14, item G. Additional articles repeated this general information. *Id.* Finally, on December 20, the paper ran an article that reiterated the information detailed in the previous articles, but also included a copy of the composite image created by Pratt, along with a photograph of Rocky.

not handcuffs.[7]  After being questioned by the state, Newland identified Rocky as the man at the flea market on the morning of December 8.  The state immediately sought to amend the charges against Rocky to include the murder and assault counts.  At Rocky's counsel's request, the hearing was continued.  When it resumed on April 10, 1989, Green withdrew and Barney Ward, who had been hired by Rocky's father, began representing Rocky.

At the second preliminary hearing, as well as at trial, Newland and Russell both positively identified Rocky as the man at the flea market on December 8.  At trial, both were questioned as to why they were unable to identify Rocky in the line-up five days after the December 8 crimes but then could identify him in the pretrial and trial proceedings.  Newland explained he did not pick Rocky from the line-up because Rocky appeared differently there than he had at the flea market.  Newland recalled that at the line-up, Rocky's hair was "slicked down pretty slick," Tr. at 321, and "it appeared that he has a . . . permanent scar on his forehead, and that seemed to show up that day . . . like it was irritated or something." *Id.* at 321, 353.

On cross-examination, Ward questioned Newland as to this reasoning.  He asked Newland to examine a photograph taken of the line-up, and Newland

---

[7]Russell was at the preliminary hearing but did not testify.  While there, he saw Rocky being brought into the courtroom by police officers.

-16-

acknowledged that each man in the line-up had a band-aid over his left eye. Newland further admitted that he did not inform anyone he thought the band-aids might be covering scars, or whether he even thought this at all. Others present at the line-up also testified that neither Newland nor Russell saw Rocky with wet hair, and that Rocky's hair was dry in the line-up. Newland thus seemed to be confused about how Rocky looked on the day of the line-up and how his appearance differed from the man at the flea market.

Newland further admitted that sometime between the December 13 line-up and the February 28 preliminary hearing, he saw a photograph of Rocky in the Ada Evening News. Nonetheless, he claimed he did not identify Rocky based on seeing the picture in the paper. Rather, Newland said "I'm identifying him, or I did identify him, because I remember the face of the one who assaulted me, and that was not necessarily the same face I saw in the line-up, [he] did not appear to be the same person, [he] had a different appearance." *Id.* at 355.

Defense counsel also questioned Russell on his failure to identify Rocky in the line-up. Russell said he picked Markum out of the line-up instead of Rocky because Markum's eyes looked "more different than the most normal eyes that you see." *Id.* at 454. He also said that Rocky's hair appeared different to him at the line-up than the hair of the assailant at the flea market. He stated that "[o]n the 8th of December, when the man came into the office, it was very windy, and it

had been raining and snowing, which would have caused it to be somewhat wet, which would make it appear to be different at that time." *Id.* at 455. Russell admitted on cross-examination that he did not see a scar over the assailant's left eye, but acknowledged that Rocky had a scar "proceeding from the middle of his left eyebrow up on his forehead." *Id.* at 451.[8] He explained that at the flea market, he did not look directly into the assailant's face. The prosecution asked Russell to stand next to Rocky in the same position as he had stood in relation to the assailant on the day of the assault. While in this position, Russell testified that he was unable to see Rocky's scar.

The state presented a variety of other evidence to further its case against Rocky. At the time of the flea market crimes, Rocky was staying in Ada with his brother Allen. From time to time, Rocky also lived with his father, John Snow, in McAlester, Oklahoma. Allen worked as a mechanic for Stallings. In the course of his work, he often drove trucks in the Stallings fleet, including the burnt orange pickup. Allen testified the company policy regarding truck use was that "if you need one, the keys are in them. You just go find one that somebody ain't using and take it." *Id.* at 624. Glenn Pendergrass, bookkeeper and office manager for Stallings, testified that "depending on the job . . . [w]e'll have certain people

---

[8]Conversely, Harvey Pratt, the police sketch artist, testified at trial he was unable to see Rocky's scar while he observed him in the courtroom.

assigned to the vehicles . . . . Normally, we left the keys in [the trucks], and of course, we locked up our gate at night when we left. But normally, the keys stayed in the pickups." *Id.* at 725-26.[9]

A day or so before the flea market crimes, Rocky and Allen spent part of their evening at the Sportsman's bar in McAlester.[10] Kelly Klift, one of Rocky's girlfriends,[11] and her sister Kimberly Miller, visited with Rocky and Allen at the bar. Klift testified that on at least two occasions, Rocky informed her he would be returning to McAlester in a couple of days. He said he was driving one of the Stallings trucks from Ada to McAlester for his brother, and that Allen had offered to pay him to accomplish this task. Allen did not participate in these conversations, but was close at hand when Rocky shared this information with Klift. Rocky testified Allen told him "that if Mr. Stallings had a pickup for . . . [Allen] to take to McAlester, and that if I wanted to go home, that I could drive the truck for him instead . . . ." *Id.* at 900. Allen was going to give Rocky thirty-

---

[9]Glenn Pendergrass also testified that Rocky had never been employed by Stallings. Rocky had applied for a job by filling out an employee identification questionnaire. The company kept these questionnaires on file in case they needed to hire anyone.

[10]Trial testimony is unclear regarding whether Rocky and Allen's evening at the Sportsman's bar occurred on December 6 or 7. On direct appeal and during the state and federal habeas proceedings, however, the parties appear to agree that the events at the Sportsman's bar occurred on December 6, 1989.

[11]Rocky had two girlfriends: Kelly Klift, who lived in McAlester, and Marcia Cross, who lived in Ada.

five dollars for gas. Allen testified otherwise, stating Rocky had informed him he would be returning to McAlester but that he had sorted out his own transportation. Rocky did not own a car.

The following day, on December 7, Rocky and Allen went to the Ada flea market to do some Christmas shopping. They were accompanied by Marcia Cross, Rocky's other girlfriend. Allen testified that after making a purchase, Rocky commented that one of the flea market salesmen had a great deal of money and it would be easy to knock the man in the head and steal from him. Allen "told [Rocky] that if he was going to be . . . doing this kind of thing[], . . . [he] didn't want him around [his] house, because [he] was tired of doing time . . . ." *Id.* at 627, 651.[12] Rocky denied engaging in this conversation. Later that night, Rocky and Allen went to see a film, where another movie patron, Melvin Jones, observed Rocky "wearing blue jeans, a light colored sweatshirt and a gray zip-up type sweat jacket with a hood and high-top tennis shoes." *Id.* at 968. Jones also stated Rocky's hair was longer in the back, and "probably went down to his collar . . . ." *Id.*

On December 8, the day of the murder and assault, Allen testified he awoke

---

[12]Allen admitted to having a substantial criminal record. At the time of trial, he had already amassed six prior convictions, including four second degree burglaries and one armed robbery. At the time of trial, Allen was serving time in jail as the result of his continued criminal activity.

-20-

at 6 a.m., and went to work. He claimed he worked in the Stallings yard until about 9 a.m., at which point he used the burnt orange truck to drive back to his apartment and wake up Rocky. Allen testified he then returned to the Stallings yard and stayed there until noon. The state thereafter presented a sales receipt from a local store, B&M's Auto Parts, time stamped 9:54 a.m. and signed by Allen. With his memory refreshed, Allen testified that after he had awakened Rocky, he went to the auto parts store before returning to the Stallings yard. *Id.* at 639. Once back at the yard, Allen worked with John Higgenbotham, another Stallings employee.

Higgenbotham testified he had been in and out of the Stallings yard that morning, returning at about 10:30 a.m. with a radiator. "Allen helped [him] unload the radiator out of [his] pickup, and [they] put it over in front of the Mack truck that it was to go on." *Id.* at 720. Higgenbotham said the two men then chatted for a while, until just before 11 a.m. As Higgenbotham left the yard, he checked his watch because he was in charge of keeping his own hours for work. He proceeded to the bank to cash a personal check. While there, he overheard bank staff discussing the flea market crimes which had just occurred.

Charles Waldrop, another Stallings employee, also generally verified Allen's testimony regarding his time at the Stallings yard that morning. Waldrop testified that Allen spent the morning repairing the company truck Waldrop used,

and that Allen was in and out of the yard purchasing parts. Waldrop thought he last saw Allen returning to the Stallings yard in the burnt orange truck at around 9:30 a.m. He was not aware whether Allen made any other trips that morning.

Emory Holt testified he arrived at the Stallings yard sometime after 10 a.m. that day to pick up a paycheck. As he was driving toward the yard entrance, he saw the burnt orange red truck being driven out by a man he later identified as Rocky. He testified he paid close attention to who was driving the truck because he had been laid off from work two days prior and was curious to see who Stallings was currently employing. He was certain the driver was not Allen. Holt went into the business office to collect his check and chatted with two employees who were there. He then left the Stallings yard and went to cash his check at an establishment near the flea market. Soon thereafter, he heard police sirens and saw an ambulance drive by. When he left, he noticed the flea market was closed and surrounded by emergency vehicles.

Allen testified he left the Stallings yard around noon for lunch and noticed the burnt orange truck was missing. He also testified that he thought he heard the truck start up around 10 or 10:30 a.m. Waldrop and Pendergrass also noticed the truck was missing around 11:30 or noon that day.

Rocky testified to the events of the morning of December 8, but his account varied in several respects from that presented by the other witnesses at trial. He

said that sometime after 10 a.m., Allen came by the apartment to get him. Rocky testified

> there was money, if I remember right, laying in the seat of the pickup with some receipts from a purchase he had made and some boxes. And we went to the Stallings yard, and then we both got out and went in. We carried the stuff he had purchased inside the shop, and we stood around there for a while . . . I would say, maybe fifteen, twenty minutes, maybe even longer than that. And then he gave me the keys to the pickup. He said, "I'll see you tonight." I said "O'kay," and as I was leaving the yard, I seen several employees. I nodded to them, left the yard, and I went straight to Holdenville.

*Id.* at 901.[13] Except for Holt, who testified to seeing Rocky drive out of the Stallings yard in the burnt orange truck sometime after 10 a.m., no one else claimed to have seen Rocky at the Stallings yard that morning.

On cross-examination, Rocky reaffirmed his testimony that Allen had come by the apartment to wake him up around 10 a.m. and that they left together to go to the Stallings yard. He further testified he was constantly with his brother, or in the truck, from the time Allen picked him up. He remembered seeing someone driving into the Stallings yard as he was leaving with the truck. Rocky agreed with the state that the assault and murder probably occurred around 10:45 a.m., that the police were called at 10:47, and that the truck seen at the flea market was the burnt orange truck he drove to Hartshorne. *Id.* at 914.

---

[13]Holdenville is about eleven miles north of the halfway mark between Ada and McAlester.

At this point, the state asked Rocky how it could be that the truck he was with from 10 a.m. onward, either with his brother or driving toward Hartshorne, could also have been at the flea market. Flummoxed, Rocky rapidly refined and revised his testimony. He said

> I was at the Stallings yard. We got there right around --- from the previous testimonies that I have heard, I can only assume my time frame, and from what even my brother has said, that he purchased the parts around 9:54 that morning. I know he came, possibly, directly to the house. He picked me up, and if you're counting time-wise, he picked me up at 10:00. We went to the yard. We went straight to the yard, and he – See I must have been there ten minutes, probably ten minutes, on the yard *before he left, and when he came back, it was possibly around, I don't know, 10:45*. I know I was there on the yard for a long time, and we visited that long.

*Id.* at 917 (emphasis added).

Indicating surprise, the prosecutor asked Rocky why he did not include in his earlier testimony the very important information that his brother left the Stallings yard. Rocky simply answered, "I was not asked." *Id.* at 917. The prosecutor then asked Rocky to clarify what time he left the yard after Allen allegedly returned. Rocky began to say that he left Stallings around 10:45 a.m., but then stopped himself. He then stated "Allen was back around 10:47, so I couldn't have left or left at 10:45, so I had to have left a few minutes before 11:00." *Id.* at 919. Rocky then added that Allen "had [him] in a garage working on some brakes" for a semi and a half-ton truck. *Id.* at 919-20. What is clear is

that sometime during these varied time lines, a man arrived at the flea market in a burnt orange faded red truck, murdered Bush, and assaulted Newland.[14]

Rocky further testified that when he left the Stallings yard, he drove to Holdenville. While in Holdenville, he shopped at a Wal-Mart, put gas in the truck and checked its oil, stopped for a pizza, and then proceeded to McAlester. Once in McAlester, Rocky stopped to visit his father, John, who expressed concern about Rocky driving a Stallings truck. Rocky claimed his father said

> "Well, what are you doing with the pickup," and I told him, I said, "Allen had me bring it down here to Mr. Stallings, and hopefully, I can get me a job for Mr. Stallings." And my dad said, Rocky, don't trust him. You know how he is, because he has always had . . . a personal problem against you.

*Id.* at 903. John Snow did not testify at trial.

Rocky then went to the home of Karen Black, where his girlfriend Kelly Klift was assisting Black in her babysitting business. Klift remembered Rocky arrived between 1:15 and 1:30 p.m. in the Stallings pickup truck. She and Black both testified that Rocky looked dirty. "He had oil on his jeans and dirt. His hair was messed up." *Id.* at 579, 604.[15] Black said Rocky told her he had been

---

[14]As noted earlier, the weapon was never found. Nor were the police able to obtain much physical evidence from the scene of the crime. The police did make a plaster cast of a boot print, and they took photographs of a tire track and skid marks in the alley behind the flea market as well as of Rocky's tennis shoes in Allen's apartment.

[15]Klift testified that later she had a conversation with Rocky about what he
(continued...)

working for Stallings Construction driving a truck. Tim Webb, a friend Rocky

spoke to later that day, also testified that Rocky informed him "he was working

for J.B. Stallings part-time, and that's why he had the truck." *Id.* at 672.[16]

Although Rocky testified he was to deliver the truck to the Stallings yard in

Hartshorne, he nonetheless engaged in a number of activities before doing so and

attempted to find a place to leave the truck while he accomplished his personal

tasks. He initially tried to leave the truck with Webb, but Webb declined so

Rocky left the truck at Klift's home.

Using Klift's car, Rocky and Klift ran a number of errands and then went

back to Rocky's father's home. Rocky testified his dad expressed anger toward

---

[15](...continued)
was wearing when he arrived and that he confirmed he was wearing boots, jeans, a t-shirt, and a thicker plaid shirt. Later, however, Rocky told her he was wearing tennis shoes. Allen testified Rocky was wearing work boots that day.

Rocky's sister, Angelia Stanley, testified that on November 29, 1989, she cut Rocky's hair quite short. She said that "his hair used to be real long . . . it had real bad dead ends, and [Rocky] told [her] cut it all off. In order to get all that off, [she] had to cut it short, and then [she] messed up, and [she] had to really cut it short." *Id.* at 795.

Klift verified Stanley's version of events. On November 29, she underwent a one-day surgical procedure. Rocky came to see her before the procedure, and then again afterward. Klift testified that his hair had been cut between the time she had the operation and when she saw him afterwards.

[16]Gilbert Lawrence, president of Stallings, indicated that only he or J.B. Stallings, owner of the company, had the authority to permit an employee to drive one of the company trucks from one location to another and that he did not give Rocky permission to do so. Pendergrass also testified that Rocky had never been hired to drive a truck from Ada to Hartshorne. J.B. Stallings testified similarly.

Allen about something, and Klift testified that John told Rocky "to take [the truck] back to the yard and wipe the fingerprints off of it." *Id.* at 583. Instead of immediately doing so, Rocky continued with his own agenda. Klift and Rocky eventually returned to Black's residence to pick up Black's children and take them out for pizza. When they finished dinner and returned the children to Black's house, Rocky and Klift went back to her home to get the truck. Klift followed Rocky in her car while he drove the truck to the Stallings yard in Hartshorne. Klift gave Rocky a rag and he wiped off the truck per his father's instructions. Rocky commented that he thought Allen might be trying to set him up.

The next day, Rocky, Klift, and Miller went shopping and encountered an angry Allen at the McAlester Wal-Mart. Klift remembered Allen saying "something about the truck and that he wasn't going to go to prison for anyone." *Id.* at 592. Allen testified he asked Rocky "if he took the truck and had anything to do with the killing over . . . in [Ada], and [Rocky] denied both of them." *Id.* at 637. Rocky testified Allen "pulled [him] aside and started telling [him] something about, 'I'm in trouble because of you.' He said, 'Why did you take the pickup to the Stallings' yard? Why are you making it look like I did it?' And [Rocky] didn't understand what he was talking about . . ." *Id.* at 908. The tension and verbal sparring between Rocky and his brother continued that

afternoon at their father's house. Later, Klift and Miller both overheard Rocky ask his father if he should go back to Ada to clear things up, but John told him not to worry about it at the moment. Rocky testified that he did not then know an assault and murder had occurred in Ada.

Sondra Campbell, a childhood friend of Rocky, testified that the following evening, December 10, she was at the Zodiac Bar in McAlester. According to Campbell, Rocky came into the bar and started chatting with her. Campbell described Rocky as wearing blue jeans, a navy-blue sweat jacket that zipped all the way up, and black army combat boots. His hair was "long, collar length, and it covered his ears." *Id.* at 762.

She said they talked about their shared childhood, and then he told her he had killed two people in Ada for money. He also told her "he went to where Allen worked and stole his truck, stole the truck from the company," *id.* at 760, but that he eventually hitchhiked back to McAlester. He asked her if she knew where he could get a hair cut, as "he needed to get it washed and cut because it smelled like blood." *Id.* at 759. Campbell testified that while she could not smell any blood, the man she was speaking with did need a haircut. Campbell asked Rocky to leave her table, and he told her "not to tell anybody, because if [she]

did, he would kill [her]." *Id.* at 760.[17]

On cross-examination, Rocky's attorney questioned Campbell about the extent of her friendship with Rocky and how long it had been since they had last seen each other and engaged in a substantive conversation. After establishing Campbell had not said more than a passing hello to Rocky over the past ten years, he asked "[a]nd you're telling this Court and jury, under oath, that he just came up to you in a tavern in McAlester and confessed to two first degree murders and armed robberies?" *Id.* at 768. Campbell answered in the affirmative. She also testified that as far as she was able to see, the man she spoke to in the bar did not have a scar on his face. But Campbell admitted she was able to see the scar on Rocky's forehead in the courtroom. *Id.*[18]

Defense counsel presented witnesses who countered Campbell's version of

---

[17]Sondra Campbell became a witness for the state just days before Rocky's trial began. Allen's girlfriend, Jeannie McNeelus, had recently befriended Campbell and expressed concern about Allen having to testify at trial. Campbell said she had not told anyone about Rocky's confession because she was afraid, but she eventually told McNeelus. McNeelus told the police about Rocky's confession to Campbell. McNeelus began cooperating with the police and recorded a subsequent conversation with Campbell in which Campbell repeated what she had previously told McNeelus. Campbell was then questioned by the police and called by the state as a witness. At trial, Campbell denied being threatened by McNeelus to testify, but she indicated they were no longer friends.

[18]Jack Stringer, an investigator on Rocky's direct appeal, interviewed Campbell in December 1992. State PC Pet., July 24, 1995, at 120. She "said everything that she testified to at trial was true to the best of her memory." *Id.* She further stated "no one threatened her after she was arrested to testify." *Id.*

events.  Robert Scofield testified that on the evening of December 10, Rocky worked for him.  Scofield was the restaurant manager at the Ramada Inn, which had hosted a banquet that evening.  Rocky was scheduled to assist Scofield in tearing down the banquet room.  Rocky arrived sometime between 9 and 10 p.m. and worked for at least three hours.  Scofield described Rocky has having collar length hair at the time.  Klift testified that she joined her mother at the banquet that evening and then around 8 or 8:30 p.m. picked up Rocky at his father's house and brought him back to the banquet to work.  She stated she was with Rocky for the entire evening and helped him on the banquet job.  Rocky's version of events was similar.  He claimed Klift picked him up around 9 p.m., and that they worked until around 11 p.m. or midnight.  Rocky denied going to the Zodiac bar that evening or engaging in any conversation with Campbell.

In an effort to further raise reasonable doubt as to Rocky's guilt, defense counsel presented testimony from Janice Benson.  Benson was the sister of Jeannie McNeelus, Allen's girlfriend, and had lived briefly with McNeelus and Allen in January 1989, just following the flea market crimes.[19]  Benson testified that on January 7, 1989, she, Allen, and McNeelus, along with Mike Tripp and Eddie Snow, Allen's cousin, were visiting at McNeelus' house.  Allen had recently moved clothing and dishes he had been storing at his father's apartment

---

[19]Allen had since moved from Ada to McAlester to live with McNeelus.

-30-

to McNeelus' home, and Benson testified that Allen and McNeelus were unpacking the boxes. According to Benson, Eddie asked Allen if Rocky had bonded out of jail, and "Allen started laughing and said, 'No, they've got him on murder.'" *Id.* at 850. Benson further testified that Allen told the group he wanted to show them something, and he went over to one of his boxes and pulled out a kitchen knife with a wooden handle on it. He said "[t]his is the knife they're looking for in Ada." *Id.* at 851. He also said he was not going to let anyone find him with it. Allen denied engaging in any such conversation.

Benson also testified that she was at McNeelus' house a few nights later watching a movie with Allen, her sister, and Eddie. There was a scene in the film where

> a man had a big drill, and he was killing [a] lady. And Allen said, "On TV, they make it look so easy to kill somebody, but it's not like that at all." He said, "When you stab somebody, you hit bones, and you hit muscle, and they start gurgling and choking on the blood."

*Id.* at 852. Allen denied this occurred.

A few days later, Benson was at McNeelus' home helping Allen and McNeelus clean up the house and yard. According to her testimony, they took boxes out of the house and drove to a dump to dispose of the trash. She testified that one of the boxes contained the knife Allen intimated was used in the Ada flea market crimes. She said she went to the police and shared this information with them. Officers Joe Hogan and Gary Rodgers drove out to the dump with Benson,

-31-

but they were unable to find the knife.  She later told her mother she had given

this information to the police, and her mother in turn told McNeelus and Allen.

According to Benson,

> Allen called me up several times, and he told me that he would kill
> me if I didn't shut my mouth about what was going on.  He said that
> he would never go back to prison, and he told me – at first he was
> just threatening me, and I told him I wasn't afraid of him.  And the
> he called me up and said, "I'm going to kill your kids if you don't lay
> off."

*Id.* at 855.  Unsurprisingly, Allen denied all of these allegations.[20]

On cross-examination, Benson admitted that when she spoke to the police,

she did not specifically identify Tripp and Eddie to the officers.  She claimed

Tripp had already threatened her life if she spoke to the police.  She also claimed

Eddie's girlfriend had threatened her.  Likewise, she testified McNeelus told her

"somebody was going to file perjury charges on me.  She said I would be sorry if

I came down here to testify.  She said she would make my life hell."  *Id.* at 861.

The state sought to undermine Benson's statements by presenting testimony

from her mother and Officer Hogan.  Her mother testified that Benson's story

about Allen with the knife was driven by revenge because Benson was angry at

---

[20]Allen did testify that soon after Rocky stopped living with him, he discovered a knife was missing.  He described the knife as having "a pretty good sized wooden handle on it . . . [with] . . . a nine, ten inch blade, real, real skinny, like it's been sharpened down for quite a few times."  *Id.* at 645.

McNeelus and Allen for stealing Benson's gun.[21]  Officer Hogan verified he had spoken with Benson about Allen's statements regarding the knife but that in his opinion, Benson was not a truthful person.

After hearing all of this evidence, the jury found Rocky guilty of the three counts against him.  At the end of the second stage proceedings, the jury recommended a death sentence.  The trial court imposed sentences of twenty years for the unauthorized vehicle use, ninety-nine years for the assault, and death for the murder.  Rocky's convictions and sentences were affirmed on direct appeal after the Oklahoma Court of Criminal Appeals (OCCA) permitted the record to be expanded with numerous affidavits.  *Snow v. State*, 876 P.2d 291 (Okla. Crim. App. 1994).  Rocky's petition for rehearing was rejected, *Snow v. State*, 879 P.2d 150 (Okla. Crim. App. 1994), and the United States Supreme Court denied his petition for writ of certiorari, *Snow v. Oklahoma*, 513 U.S. 1179 (1995).

Rocky filed his first application for post-conviction relief with the District Court for Pontotoc County in July 1995, which he was permitted to supplement in July 1997.[22]  He was denied an evidentiary hearing, and his petition was denied by

_____

[21]Benson and her mother were not close.  She testified that her mother did not raise her, they did not get along and spoke only occasionally.

[22]In his state post-conviction proceedings, Rocky was represented by staff from the Oklahoma Indigent Defense System, Capital Post-Conviction Division. Soon after his first petition was filed, the Capital Post-Conviction Division had eighty percent of its funding cut and terminated a majority of its staff.  In light of

(continued...)

the state district court in September 1997. In an unpublished opinion, the OCCA

ultimately affirmed the denial of relief. *Snow v. State*, PC 97-1350 (Okla. Crim.

App., Nov. 10, 1999). One judge dissented, asserting Rocky should have received

an evidentiary hearing regarding a number of his *Brady* claims. *Id.* at 15.[23]

Rocky filed a petition for a writ of habeas corpus in federal court in July

2000. Without conducting an evidentiary hearing, the district court denied

Rocky's request for relief. Rocky appealed, and we granted his application for a

certificate of appealability on his claims of ineffective assistance of trial and

appellate counsel, as well as his *Brady* claims.

---

[22](...continued)
these financial difficulties, Rocky's case was temporarily abated. In 1997, the
court directed that briefing on Rocky's case be completed. At that time, Rocky
was permitted to supplement his state post-conviction petition.

[23]Rocky filed a second application for state post-conviction relief
challenging his death sentence in light of the Supreme Court's decision in *Atkins
v. Virginia*, 536 U.S. 304 (2002). In *Atkins*, the Court held that the execution of
a mentally retarded individual would constitute cruel and unusual punishment
under the Eight Amendment of the United States Constitution, but left to the
states the task of "determining which offenders are in fact retarded." *Id.* at 317.
Rocky's case was remanded for a trial on the issue of his mental retardation.
*Snow v. State*, 87 P.3d 626 (Okla. Crim. App. 2004). He was found to be
mentally retarded as defined by Oklahoma law, and his sentence was modified to
life imprisonment without the possibility of parole.

## III

### *Brady Claim*

Rocky contends the prosecution withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), thereby undermining the reliability of the verdict against him. The withheld evidence included Oklahoma State Bureau of Investigation (O.S.B.I.) notes of an interview with Kris Grogins; an O.S.B.I. interview report of Duncan; videotaped interviews of a number of witnesses; the audio tape of McNeelus and Campbell discussing Rocky's confession to the flea market crimes; O.S.B.I. interview notes of Cross; O.S.B.I. interview notes of Allen and the accompanying videotape of that interview; and information regarding alleged police coercion, leading to Campbell's trial testimony and her eventual recantation of the same. Rocky claims this withheld evidence was exculpatory and its suppression raises serious doubts as to the state's case against him.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "In order to establish a *Brady* violation, a habeas petitioner must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was

-35-

material to the defense." *Banks v. Reynolds*, 54 F.3d 1508, 1516 (10th Cir. 1995) (citing *Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994); *United States v. DeLuna*, 10 F.3d 1529, 1534 (10th Cir. 1993)). *Brady* claims normally present mixed questions of law and fact, which we review *de novo*. *Foster v. Ward*, 182 F.3d 1177, 1191-92 (10th Cir. 1999); *Banks*, 54 F.3d at 1516.

Exculpatory evidence includes impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Nuckols v. Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000). However, exculpatory evidence is only material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *Banks*, 54 F.3d at 1518. The Supreme Court has further refined the *Brady/Bagley* materiality standard as follows:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citing *Bagley*, 473 U.S. at 678). *See also Scott v. Mullin*, 303 F.3d 1222, 1230-31 (10th Cir. 2002). When engaging in a materiality analysis, we are not to consider each piece of withheld evidence in isolation. *Banks*, 54 F.3d at 1518.

-36-

Rather, we review the cumulative impact of the withheld evidence; its utility to the defense as well as its potentially damaging impact on the prosecution's case. Furthermore, . . . we evaluate the materiality of withheld evidence in light of the entire record in order to determine if the omitted evidence creates a reasonable doubt that did not otherwise exist. What might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict.

*Id.* (internal citations and quotations omitted).

Rocky first raised his *Brady* claims in state court in his petition for post-conviction relief. The OCCA rejected all but three of Rocky's claims as barred under Oklahoma's Post-Conviction Procedure Act, *see* OKLA. STAT. tit. 22, §§ 1080-1089, reasoning he could have raised these claims on direct appeal but failed to do so.[24] The state court addressed the merits of Rocky's claims regarding Campbell, Grogins, and the lost videotaped interviews.[25] We begin

_____

[24]Oklahoma's Post-Conviction Procedure Act, OKLA. STAT. tit. 22, §§ 1080-1089, "embodies the principles of *res judicata* and precludes state collateral review of issues actually raised on direct appeal, as well as those issues that could have been raised on direct appeal, but were not." *Brecheen v. Reynolds*, 41 F.3d 1343, 1349 n.4 (10th Cir. 1994).

[25]The federal district court noted the procedural bar and stated it was therefore "precluded from considering the issues not raised on direct appeal." Fed. HC, rec., vol. VII, doc. 38 at 55. *See Hale v. Gibson*, 227 F.3d 1298, 1330 n.15 (10th Cir. 2000) (Oklahoma's Post-Conviction Procedure Act "is an adequate state bar to *Brady* claims raised on post-conviction review that could have been raised on direct appeal."). However, the district court held it was not necessary "to resolve [the *Brady* claims] on the basis of procedural bar since [the] Court [found] that the documents were either not suppressed from [Rocky] or they were not 'material' to his defense." Fed. HC, rec., vol. VII, doc. 38 at 55.

with the claims the OCCA addressed on the merits, recognizing we can grant relief only where the state court's resolution of Rocky's claims was contrary to, or an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 411; *McLuckie*, 337 F.3d at 1197.

Rocky alleges the state's failure to disclose police notes from Grogins' interview violates *Brady*. He claims Grogins' testimony could have undermined the state's proffered time line for the morning of December 8 and challenged Allen's alibi for his whereabouts that morning.

The police interviewed Grogins in mid-December 1989 regarding her recollection of events on the morning of December 8. She told them that sometime between 10 and 10:45 a.m. that morning, she saw Allen "drive up and park at the apartment in what looked like a company pickup. [He] left the motor running and went inside his apartment and stayed just a short time, then he came out and drove off. He came there alone and left alone." Fed. HC, rec., vol. III, doc. Y. She did not see anyone else leave the apartment, and she did not see Rocky. *Id.* Later, in an affidavit dated July 1997, she narrowed the time frame for when she saw Allen arrive to between 10:15 and 10:30 a.m. *Id.* The OCCA rejected this claim on the merits, summarily concluding in a single sentence that the information from Grogins' police interview was not exculpatory. *Snow*, PC 97-1350, at 4.

We have held that even where a state court's decision on the merits lacks analysis, we must defer to that ruling under § 2254(d) "unless our independent review of the record and pertinent federal law persuades us that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999). After engaging in an independent review of the record and the relevant federal law while remaining mindful of § 2254(d)'s highly deferential standard, we conclude the state court's ruling regarding the Grogins information was not an unreasonable application of federal law.

Grogins' statements to the police partially counter the time line presented by the state as to Allen's movements on the morning of December 8. Allen testified he woke Rocky around 9 a.m. and thereafter bought auto parts and returned to the Stallings yard. The store receipt indicated Allen made his purchase at 9:54 a.m., and Allen testified he returned to the work yard after completing this sale. Other testimony presented at trial places Allen at the Stallings yard on December 8 with Higgenbotham from about 10:30 until 11 a.m. Grogins told the police she saw Allen at the apartment sometime between 10 and 10:45 a.m., rather than at 9 a.m., as Allen attested. To this extent then, Grogin's time line could be construed as assisting Rocky because Rocky asserted Allen

-39-

came by the apartment around 10 a.m. Conversely, Grogins' statement directly undercuts Rocky's own testimony regarding the events of that morning. Rocky claimed that when Allen came to the apartment, he and Allen left together in the Stallings truck. Grogins stated she saw Allen leaving alone and did not see Rocky at all that morning. Thus, Grogin's information seems to provide more support to Allen's account of the events that morning than to Rocky's.

Moreover, we are not convinced that even if the Grogins interview had been disclosed to the defense, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. The jury had before it the uncontested testimony of Higgenbotham who stated he worked with Allen between 10:30 and 11 a.m. that morning, as well as Holt who testified he observed Rocky leaving the Stallings yard in a company truck sometime after 10 a.m. Higgenbotham testified that he went to the bank to cash a personal check after he left the Stallings yard, at which time he heard bank staff discussing a crime just committed at the flea market. Holt testified he arrived at the Stallings yard around 10 a.m. to collect his work check. He said that he saw Rocky as he was arriving. Holt obtained his check, chatted in the company office for a while with some other Stallings employees, and then went to an establishment near the flea market to cash his check. While he was there, he heard sirens and saw an ambulance drive by in the direction of the flea market.

-40-

When he finished his financial transaction, he noticed that the entrance to the flea market had been closed off and was surrounded by emergency vehicles.

Higgenbotham's and Holt's recollections of that morning are firmly anchored by their remembrance of contemporary conversations or observations of events directly connected to the flea market crimes. Thus, it had to be soon after 10:47 a.m., the time the police were called to the flea market, when Holt heard sirens and saw an ambulance while he was cashing his check. Likewise, when Higgenbotham heard employees at the bank discussing the recent commotion at the flea market, it would have been sometime after 11 a.m., as Higgenbotham testified.

Contrary to this evidence, the jury heard Rocky testify that his brother picked him up around 10 a.m. Rocky claimed that after Rocky and Allen arrived at the Stallings yard, they unloaded the truck, stood around and chatted for perhaps as long as twenty minutes, and worked on a couple of trucks. Then, according to Rocky's revised testimony, Allen left the work yard perhaps ten to fifteen minutes after they arrived and returned around 10:45 or 10:47 a.m. Rocky claims he left the Stallings yard in the burnt orange truck around 11 a.m., nodding to other Stallings employees as he was leaving. We would have to interpret the Grogins information as suggesting that when Allen allegedly left the work yard, he returned to the apartment, went to the flea market and murdered Bush and

assaulted Newland, fled the flea market in a direction taking him away from the Stallings yard, but nonetheless returned to the yard in time to assist Higgenbotham sometime between 10:30 and 11 a.m. and then turn the truck over to Rocky. This proffered time line attempts too much and cannot be squared with the firmly grounded testimony of Holt and Higgenbotham. In these circumstances, we cannot conclude the absence of Grogins' information undermines our confidence in the outcome of Rocky's proceeding. *Kyles*, 514 U.S. at 434. The state court's resolution of Rocky's *Brady* claim on this issue was not an unreasonable application of Supreme Court law. 28 U.S.C. § 2254(d).

Rocky also contends the state violated *Brady* by failing to disclose the manner by which the police procured Campbell's testimony. As discussed above, Campbell testified at trial that on December 10, she was drinking at the Zodiac Bar. She claimed Rocky came into the bar and confessed to her that he killed two people in Ada and needed to get his hair cut because it smelled like blood. She also testified that she had not been threatened to provide her testimony. Defense counsel vigorously cross-examined Campbell, and counsel presented witnesses who placed Rocky elsewhere on the night of December 10. During Rocky's direct appeal, Campbell was interviewed and affirmed the veracity and uncoerced nature of the statements she had made at Rocky's trial. But in 1997, Campbell recanted her trial and direct appeal statements. In an affidavit, Campbell stated that about

a week before Rocky's trial, McNeelus expressed fears that Allen was going to be arrested for the flea market crimes. Campbell admitted she told McNeelus that she was in the Zodiac Bar on December 10 and that a man came up to her in the bar and told her he had committed the flea market crimes. Campbell said McNeelus was very interested in what she had to say and asked if the man was Rocky. Campbell said she "had not seen Rocky in a long time, but the man could have been Rocky Snow." Fed. HC, rec., vol. III, doc. 14, item H. Campbell claimed that later the same evening, she and McNeelus had another conversation in which McNeelus appeared to be acting strange and asked Campbell to repeat what she had said in their earlier conversation.[26]

---

[26]Campbell later learned McNeelus was taping their conversation. Rocky contends the tape recording of the conversation was withheld by the state, constituting a *Brady* violation. Rocky first raised this claim in his state application for post-conviction relief. The OCCA deemed the claim waived because direct appeal counsel could have raised it but did not. The federal district court conducted an analysis on the merits and concluded the tape was not withheld. We are not convinced the tape was made available to defense counsel during trial, but we nonetheless conclude the material on the tape was not exculpatory to Rocky.

Like the district court, we listened to the tape and found it extremely difficult to understand. No transcript accompanied the tape, and the voices on the tape, many of which clearly did not belong to McNeelus or Campbell, are unidentified. Moreover, based on what we were able to discern from the tape, nothing McNeelus or Campbell says is exculpatory. McNeelus is certainly proactive during her conversation with Campbell, steering the discussion to Rocky's impending trial and his alleged confession to Campbell at the Zodiac bar. However, when questioned by McNeelus about what happened on December 10, Campbell never specifically says that the man was not Rocky, nor does she

(continued...)

According to Campbell's affidavit, at approximately 3 a.m. the following morning, Ada police arrested her as a material witness and held her for questioning. The police would not let her call anyone to take care of her daughter, but instead made her take her child to a youth shelter. The police also allegedly told her she could not call a lawyer until she had spoken with them. "They told [her] that if [she] did not tell them what they wanted to hear, they would leave [her] in jail and take [her] little girl away from [her.]" *Id.* The police accused Campbell of withholding state's evidence and stated "that they could keep [her] in jail until [she] told them the story [she] had told Jeannie." *Id.*

Campbell also asserts the police showed her a photograph of Rocky and that she told them "the man in the picture was not the man [she] saw in the Zodiac." *Id.* She "told the officers the man [she] saw did not have a scar and had sandy brown hair rather than dark brown hair. [She] told the officers [she] was positive the man [she] saw in the Zodiac was not Rocky Snow." *Id.* According to Campbell, the police did not care and told her she was lying. She claims the

[26](...continued)
correct McNeelus when McNeelus consistently asks about what Rocky said or what he was wearing that night. In response to McNeelus' questions, Campbell indicates, without specifically saying "Rocky said . . . ," that Rocky confessed he killed the people at the flea market and that he needed to get his hair cut because it smelled like blood. She also stated that Rocky said "he did it." Fed. HC, rec., vol. VI, doc. 23. Campbell's taped statements are nearly identical to those she made at trial. We are therefore unpersuaded this information is exculpatory to Rocky.

officers told her she "had already said it was Rocky Snow once, and that if [she] did not say it again, they would put [her] in jail and take [her] little girl." *Id.* An officer also told her she "might never get [her] little girl back if [she] had to go to jail and was convicted of withholding state's evidence." *Id.* Campbell then wrote a statement at the direction of the police. She claims the police told her exactly what to write. Campbell asserts in the affidavit that she has "felt guilty for almost ten years for lying and causing Rocky Snow to go to prison." *Id.* She did not tell the truth because she was afraid of losing her daughter and scared Allen might harm her. She claims she is willing to "testify or do whatever is necessary to tell this story to whoever needs to hear it." *Id*.

Rocky contends that had defense counsel known Campbell was allegedly coerced into giving her testimony, there would have been a reasonable probability the outcome of his trial would have been different. *Bagley*, 473 U.S. at 682; *Banks*, 54 F.3d at 1519. The OCCA rejected Rocky's argument that Campbell had been coerced, noting that at trial and during direct appeal she attested otherwise. The court also rejected Rocky's claim that Campbell had lied at trial. In considering the entire record as a whole, the state court concluded that information regarding Campbell's alleged lying would not have resulted in a different outcome at Rocky's trial.

The state court's ruling was not an unreasonable application of established

-45-

Supreme Court authority.  28 U.S.C. § 2254(d).  First, the only potentially relevant *Brady* material the state could have turned over in terms of Campbell's testimony at the time of trial was handwritten police notes regarding Campbell's arrest and initial police interview.  Those notes would have indicated that on June 13, 1989, McNeelus engaged in a taped conversation with Campbell regarding Rocky's alleged December 10 confession at the Zodiac bar.  McNeelus then provided police with the tape, after which the police obtained a material witness warrant to arrest Campbell.  Campbell was arrested at 3 a.m. the following morning and questioned by police.  According to the notes, Campbell told

> officers that she . . . was glad Jeannie McNeelus told law-enforcement officers about their conversation regarding Rocky Dale Snow. [Campbell] advised officers . . . she had worried greatly about what she . . . was told by Rocky Dale Snow and being scared to tell anyone due to the threat Rocky Dale Snow made to her . . . on December 10, 1988.

Fed. HC, rec., vol. III, doc. 14, item DD.  There is nothing exculpatory about this report.

Moreover, even assuming Campbell lied about Rocky's confession, our confidence in the outcome of Rocky's trial is not undermined.  *Bagley*, 473 U.S. at 682.  At trial, Campbell was vigorously cross-examined by defense counsel, raising great doubts as to the veracity of her testimony.  Similarly, defense counsel presented Klift and Scofield as witnesses who further undermined Campbell's credibility and placed Rocky elsewhere on the evening Campbell

claims he confessed to her at the Zodiac bar. Neither witness was subjected to significant cross-examination by the state. Campbell's credibility was thus placed squarely before the jury. The OCCA's rejection of Rocky's *Brady* claim regarding Campbell's subsequent affidavit was not an unreasonable application of Supreme Court law. Rocky can likewise find no relief in his claim regarding the lost videotaped police interviews. In the course of investigating the case against Rocky, the police interviewed a number of witnesses and videotaped some of those interviews. Rocky claims the state lost the videotapes, which he asserts contain exculpatory and material evidence.

The OCCA appears to have addressed this *Brady* claim only in relation to the undisclosed information in an O.S.B.I. interview with Allen, which included a videotape of the interview, although Rocky's petition for state post-conviction relief was not so limited. *See* State PC Pet., July 24, 1995, at 53. The state court, without explicitly commenting on whether Rocky's videotape argument was procedurally barred, summarily rejected the claim, stating Rocky "disclose[d] no information regarding the videotaped interview to show that it is exculpatory or that it contains newly discovered evidence." *Snow*, PC 97-1350 at 5-6. The federal district court also gave this argument passing reference, stating Rocky "has failed to submit any evidence that . . . any of the videotapes of the various interviews . . . were exculpatory." Fed. HC, rec., vol. VII, doc. 38 at 62.

Supreme Court authority makes clear that when dealing with lost or destroyed evidence, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially useful evidence* does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (emphasis added). In this setting, the Court has noted "the difficulty of developing rules to deal with evidence destroyed through prosecutorial neglect or oversight. Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *California v. Trombetta*, 467 U.S. 479, 486 (1984). The Court therefore imposed the requirement that the defendant show bad faith on the part of the police when potentially exculpatory evidence is lost or destroyed. *Youngblood*, 488 U.S. at 58. *See also United States v. Fletcher*, 801 F.2d 1222, 1224-25 (10th Cir. 1986) ("Absent evidence of police or prosecutorial bad faith or misconduct, [relief is] warranted only if the missing evidence possesses an exculpatory value that was apparent before the evidence was destroyed."). Rocky presents, at most, a conclusory argument that the lost videotapes might have contained exculpatory material. Furthermore, he takes no specific posture as to whether the tapes were lost as a result of bad faith by the police or prosecutors. Under these circumstances, Rocky is not entitled to relief on this claim

Moreover, we are not convinced Rocky can succeed on any of his other *Brady* claims. Rocky contends the state failed to disclose a number of O.S.B.I. reports detailing interviews conduced by the Ada Police Department in the course of investigating the flea market crimes. He argues the information contained in those reports is exculpatory and material. In particular, he points to O.S.B.I. interviews with Allen, as well as with Cross and Duncan. The OCCA rejected all of these claims as procedurally barred because they could have been raised on direct appeal but were not. The district court ultimately rejected the claims on their merits, essentially concluding that the withheld information was not material.

We can avoid deciding procedural bar questions where claims can readily be dismissed on the merits. *Cannon*, 383 F.3d at 1159. Rocky reasserts many of these issues as part of his claim of ineffective assistance of appellate counsel in an attempt to clear any procedural bar that may exist by his failure to raise these claims on appeal. *See Murray v. Carrier*, 477 U.S. 478, 489-90 (1986) (claim of ineffective assistance of appellate counsel can serve as cause and prejudice to overcome procedural bar); *Johnson v. Gibson*, 169 F.3d 1239, 1251 (10th Cir. 1999) (same). Thus, we must address the merits of these claims in any event.

Rocky claims the information contained in the O.S.B.I. interview notes of Allen differed significantly from the testimony Allen provided at trial. In

particular, Allen did not mention in his O.S.B.I. interview that he left the Stallings yard to go home and wake Rocky, and the interview notes also state Allen left for work at 7 a.m. At Rocky's preliminary hearing, Allen testified he went to wake his brother sometime between 8:30 and 9 a.m., Prelim. Hearing, April 10, 1989 at 126, and that he also left the Stallings yard to get parts on that day. *Id.* at 127.[27] At trial, Allen said he awoke and left for work around 6 a.m., and returned to the apartment around 9 a.m. to wake his brother. Rocky asserts that the inconsistencies in Allen's recollection of events could have served to impeach Allen's trial testimony and further the defense's theory that Allen, rather than Rocky, was responsible for the flea market crimes.

Impeachment evidence is exculpatory for *Brady* purposes. *Bagley*, 473 U.S. at 676. *See also Napue v. Illinois*, 360 U.S. 264, 269 (1959) (conviction based on false testimony not corrected by the state violates Fourteenth Amendment); *Alcorta v. Texas*, 355 U.S. 28, 31-32 (1957) (conviction based on testimony known by prosecutor to be false violates a defendant's right to due process). Although Allen did not tell the police he returned to the apartment to wake Rocky, we are not convinced there is a reasonable probability that the result

---

[27]In the affidavit for Rocky's arrest warrant, dated December 12, 1988, police detailed Allen's recollection of events the morning of December 8. In this account, Allen stated that sometime between 9 and 9:30 a.m., he left work to return to his apartment to wake Rocky.

of Rocky's trial would have been different if the O.S.B.I. interview of Allen had been disclosed to the defense. *Bagley*, 473 U.S. at 682; *Banks*, 54 F.3d at 1519.[28] Rocky's own testimony was that Allen returned to the apartment that morning. The only relevant inconsistencies that existed on this issue were between Rocky's proffered timing of events and his assertion that he returned to the Stallings yard with Allen, and Allen's claim that he merely went to the apartment to wake Rocky. The interview notes of Allen were not helpful to Rocky on this point.

Rocky also claims information contained in the O.S.B.I. reports from interviews with Cross and Duncan was exculpatory and material. Cross was pregnant with Rocky's child, and Rocky informed Cross just prior to the flea market crimes that he was neither able to, nor interested in, supporting her and the child. He also was currently dating Klift. In the undisclosed O.S.B.I. interview notes, Cross described Rocky as

> a white male about six feet tall, weight about 160 pounds, and he had blue eyes and blond hair. Rocky had dyed his hair darker, but he had recently got a spike haircut and that cut most of the color off his hair in front. His hair was about collar length in the back and it was a little darker than the front.

---

[28]It is not entirely clear that this information was withheld by the state. Rocky claims the O.S.B.I. interview with Allen was not disclosed, but he has presented no evidence verifying this assertion. Indeed, trial counsel submitted an affidavit in support of Rocky's state habeas proceeding in which counsel indicated he did not receive O.S.B.I. reports of Grogins, Duncan, or Cross, but he did not refer to any other undisclosed O.S.B.I. reports. *See* Fed. HC, rec., vol. III, doc. 14, item BB.

Fed. HC, rec., vol. III, doc. 14, item D. Cross also acknowledged she spoke with Allen soon after the flea market crimes and complained about how Rocky was treating her. Allen allegedly told her that the police were investigating Rocky and that Cross could turn him in. During the O.S.B.I. interview, the police showed Cross the composite drawing created by Pratt. Cross commented that the drawing looked like Rocky. However, she noted Rocky had a scar over his left eye, but that "the scar was not noticeable at a distance." *Id.*

Duncan was Cross's friend and had known Rocky for a couple of months. She turned Rocky into the police after deciding the composite image looked like him. In her O.S.B.I. interview, she claimed Rocky used to have long bleached hair that was almost white blond but that "around December 5, 1988, [he] had his hair cut and changed to its natural color of light brown." *Id.* Duncan was not particularly fond of Rocky because she did not like how he was treating Cross. She affirmed that she, Cross, and Allen had had a conversation about how Cross could "get back" at Rocky, during which Allen had suggested they could turn Rocky in to the police. *Id.*

Rocky has not pointed to anything in either Duncan's or Cross' O.S.B.I. interview reports that can be deemed exculpatory or material. Duncan's and Cross' statements that Rocky looked like the man in the composite image is more inculpatory than exculpatory, and the women's statements regarding Rocky's hair

are hardly exculpatory. Duncan's testimony that Rocky had his hair cut around December 5 provides only the limited information that after Rocky had his hair cut, his hair color was a natural light brown rather than the white blond hair he had worn previously. Cross stated Rocky's hair was collar length in the back and a little darker in the front. This description does not significantly depart from how trial witnesses Newland, Russell, Scofield, and Jones described Rocky.

Finally, even if Allen did tell Cross and Duncan they could turn Rocky into the police to "get back at" him for treating Cross poorly, and even if this information had been disclosed to the defense prior to trial, we are not persuaded "there is a reasonable probability that . . . the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. At most, this information might further Rocky's argument that there existed animosity between him and his brother that might have led Allen to implicate Rocky in the flea market crimes. But the jury heard evidence of strife between the brothers through Rocky's testimony and that of Klift and Miller. Moreover, any implication of festering enmity between Allen and Rocky was undercut by Rocky's own testimony that he was living with his brother in Ada and that they went drinking and Christmas shopping and attended a movie together. The fact that defense counsel was not provided access to Duncan's and Cross' "get back at" comments does not undermine our confidence in the outcome of Rocky's trial. Their "get back at" statements do not indicate in

any way that the other information in their O.S.B.I. reports was untrue.  In light

of the above, we are not persuaded Rocky is entitled to relief on his *Brady*

claims.[29]


# IV

*Ineffective Assistance of Trial Counsel*

Rocky also contends his trial attorney was ineffective during the

---

[29]On appeal, Rocky requests that his case be remanded to the district court for an evidentiary hearing if he is not entitled to direct relief on his claims. Pursuant to 28 U.S.C. § 2254(e)(2), if a petitioner "has failed to develop the factual basis" of his claim in state court, an evidentiary hearing can only be provided in federal court if he satisfies one of the two exceptions laid out in the statute.  However, if a petitioner has been diligent and attempted to develop the factual basis of his claim in state court, "we may proceed to consider whether a hearing is appropriate, or required under pre-AEDPA standards." *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998).

Rocky was diligent in developing the factual bases of his post-conviction claims.  When seeking such relief from the Oklahoma courts, he requested an evidentiary hearing, which was denied.  He provided the state court numerous affidavits and other evidence to support his claims.  *See Cannon v. Mullin*, 383 F.3d 1152, 1177 (10th Cir. 2004) (diligence requires requesting an evidentiary hearing as well as presenting readily available evidence to support claim). Therefore, Rocky would be entitled to an evidentiary hearing in federal court "so long as his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." *Miller*, 161 F.3d at 1253.  In making this determination, we apply deference pursuant to AEDPA to any determination on the merits by the OCCA of any of these claims.  *See Hammon v. Ward*, 466 F.3d 919, 928 (10th Cir. 2006).  As we discuss throughout the body of our opinion, we are not persuaded Rocky's allegations entitle him to habeas relief on either his *Strickland* or *Brady* claims.  Therefore, we decline to remand for an evidentiary hearing.

guilt/innocence stage of his trial. He bases this claim on counsel's failure to challenge the in-court identifications made by Newland and Russell; to request a continuance after Campbell was added at the last minute as a witness for the state; to object to the state's entry of irrelevant evidence; and to investigate and present additional evidence to raise a reasonable doubt as to his guilt.

Ineffective assistance of counsel claims are examined under the familiar rubric laid out by the Supreme Court in *Strickland*. "To establish ineffective assistance of counsel, a petitioner must prove that counsel's performance was constitutionally deficient and that counsel's deficient performance prejudiced the defense, depriving the petitioner of a fair trial with a reliable result." *Boyd v. Ward*, 179 F.3d 904, 913 (10th Cir. 1999) (citing *Strickland*, 466 U.S. at 687). To satisfy the deficiency prong, Rocky must show his attorney's performance "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, in that counsel's performance was not "within the range of competence demanded of attorneys in criminal cases." *Id.* at 687. In making this determination, "the Supreme Court admonishes us to free our inquiry from 'the distorting effects of hindsight' by indulging in a strong presumption counsel acted reasonably. Thus, counsel's performance will not be deemed deficient if it 'might be considered sound trial strategy.'" *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000) (quoting *Strickland*, 466 U.S. at 689).

In addressing *Strickland*'s prejudice prong, Rocky must show that "but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different." *Boyd*, 179 F.3d at 914 (citing *Strickland*, 466 U.S. at 694). "The prejudice defendant must demonstrate is by less than a preponderance of the evidence: 'a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of trial.'" *Fisher v. Gibson*, 282 F.3d 1283, 1307 (10th Cir. 2002) (quoting *Strickland*, 466 U.S. at 693). *See also Sallahdin v. Gibson*, 275 F.3d 1211, 1235 (10th Cir. 2002) ("To establish prejudice, [defendant] must show that, but for counsel's errors, there is a reasonable probability the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."). In these circumstances, "we look at the totality of the evidence, not just the evidence helpful to" Rocky. *Boyd*, 179 F.3d at 914.

A. Failure to challenge in-court identifications

Rocky contends his attorney was ineffective for failing to challenge the in-court identifications provided by Newland and Russell. He asserts that, prior to trial, counsel should have sought a motion to suppress the identifications, or should have objected to their introduction at trial and requested the trial court to issue a cautionary instruction to the jury regarding the use of eye witness identification evidence. Rocky raised these concerns on direct appeal.

When a pretrial identification occurs under impermissibly suggestive circumstances and the in-court identification of the witness is unreliable, the identification should be excluded. *See Grubbs v. Hannigan*, 982 F.2d 1483, 1489-90 (10th Cir. 1993); *United States v. Aigbevbolle*, 772 F.2d 652, 653 (10th Cir. 1985). However, we are not required to suppress a suggestive or tainted confrontation in and of itself. "The totality of the circumstances must be considered to determine whether sufficient independent basis for the identification leads one to conclude that the identification is reliable." *United States v. Williams*, 605 F.2d 495, 498 (10th Cir. 1979). Hence, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

In *Neil v. Biggers*, 409 U.S. 188 (1972), the Supreme Court laid out a series of factors to consider in determining whether an in-court identification is reliable. They are:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witnesses' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200. These factors must be weighed against "the corruptive effect of a suggestive pre-trial identification procedure to determine whether the identification testimony should have been suppressed." *Grubbs*, 982 F.2d at 1490

(citing *Archuleta v. Kerby*, 864 F.2d 709, 711 (10th Cir. 1989); *United States v. Thurston*, 771 F.2d 449, 453 (10th Cir. 1985)).  In so doing, a court must ask whether "under all the circumstances of [the] case, there is 'a very substantial likelihood of irreparable misidentification.'" *Manson*, 432 U.S. at 116 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

Folding this analysis into an ineffective assistance of counsel claim, the first question is whether trial counsel was deficient here for failing to move for the suppression of the in-court identifications.  If so, the second question is whether the failure to take such action prejudiced Rocky, i.e., whether "there is a reasonable probability that, but for counsel's unprofessional error[], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  In this regard, Rocky must show "he would likely have prevailed on the suppression motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted." *Thomas v. Varner*, 428 F.3d 491, 502 (3rd Cir. 2005).

On direct appeal, the OCCA rejected Rocky's claim that his attorney was ineffective for failing to suppress or object to the in-court identifications.  The court stated "defense counsel cross-examined the witnesses extensively to weaken their credibility.  The failure to object appears to be trial strategy.  As such it cannot be a grounds for a claim of ineffective assistance of counsel." *Snow*, 876 P.2d at 295 (citing *Strickland*, 466 U.S. at 694).  The OCCA also acknowledged

trial counsel failed to request a cautionary instruction regarding the eye witness identifications, but held there could be no claim of ineffective assistance of counsel on this question unless the failure to request such an instruction represented a "substantial violation of [Rocky's] rights. Such a violation will be found if there is a very substantial likelihood of misidentification." *Id.* at 295 (citing, in part, *Manson*, 432 U.S. at 113). In this regard, the court determined Newland's and Russell's identifications of Rocky were reliable.

> Certainly the reliability of the in-court identification by both Newlund [*sic*] and Russell is weakened by the fact each failed to identify the appellant in the police line-up. However, where this fact was thoroughly brought out by cross-examination, each witness testified he identified appellant in court based on his memory from the time of the crimes, and the jury was properly instructed it was the sole judge as to the credibility of the witnesses, and the circumstantial evidence supports the identification as well, we cannot say there is a very substantial likelihood the witnesses misidentified the appellant.

*Id.* at 295.

In addressing Rocky's identification concerns raised in his federal habeas petition, the district court held the state court's decision was not contrary to or an unreasonable application of Supreme Court law. The court stated:

> Trial counsel's strategy seems obvious from the record . . . . Specifically, defense counsel spent a great deal of time emphasizing that the eyewitnesses were unable to pick out the petitioner during a lineup held within a few days of the crime. In fact, defense counsel vigorously challenged the validity of both the eyewitnesses' identifications at trial. . . . The trial transcript leaves no doubt in this Court's mind that trial counsel's strategy was an attempt to get

> [Rocky] acquitted of this horrendous crime by arguing the
> eyewitnesses failure to identify [Rocky] in the lineup, and the failure
> to notice the scar on [Rocky's] forehead, created reasonable doubt as
> to [Rocky's] guilt.

Fed. HC, rec., vol. VII, doc. 38 at 17, 19. Moreover, the district court was not convinced those identifications would have been suppressed even if trial counsel had attempted to challenge them. The court determined that despite the suggestiveness that might have existed in the context of Newland's and Russell's identifications of Rocky, those identifications were nonetheless reliable. *Id.* at 20-21. The court therefore held "the Oklahoma Court's adjudication of this issue was not contrary to, nor an unreasonable application of the Supreme Court law to the facts of this case." *Id.* at 22. The court similarly determined trial counsel was not deficient for failing to request a cautionary instruction regarding the eye witness testimony. *Id.* It concluded by stating that

> even if this court were to second guess counsel's conduct and find
> counsel's failure to challenge the identifications was unreasonable,
> based upon the overwhelming circumstantial evidence against
> [Rocky], the extensive cross-examination of defense counsel on the
> eyewitness' discrepancies and the jury instructions as a whole, this
> Court does not believe that [Rocky] has established "a reasonable
> probability that, absent the errors, the fact finder would have had a
> reasonable doubt respecting guilt." [*Strickland*,] 466 U.S. at 644.
> Accordingly, [Rocky] has failed to establish prejudice and therefore,
> is not entitled to any relief.

*Id.* at 24.

We agree with the district court. Even if, in our own independent

judgment, we might be inclined to reach a different result, we are not convinced that the OCCA's resolution of Rocky's claim on this issue was objectively unreasonable pursuant to § 2254(d). *McLuckie*, 337 F.3d at 1202. It is certainly arguable that trial counsel was deficient for failing to raise some form of objection to Newland's and Russell's identifications. *See, e.g., Thomas*, 428 F.3d at 500 (failure to seek suppression of suggestive identification not reasonable trial strategy); *Tomlin v. Myers*, 30 F.3d 1235, 1238-39 (9th Cir. 1994) (failure to object to identification occurring during illegal lineup was unreasonable trial strategy); *Rodriguez v. Young*, 906 F.2d 1153, 1160 (7th Cir. 1990) (attorney's proffered reasons for failing to move to suppress impermissibly suggestive identification not sufficient to be deemed reasonable trial strategy). But we are not persuaded any such objection or motion to suppress would have been successful. Without clearing this first hurdle, *see Thomas*, 428 F.3d at 502, Rocky cannot show he suffered prejudice as a result of his attorney's actions.

As noted by the OCCA on direct appeal, if defense counsel had objected to the eye witness identifications, the trial court would have conducted a hearing to determine whether the identifications were reliable. *Snow*, 867 P.2d at 255. In such a hearing, counsel would have presumably challenged Newland's and

Russell's identifications of Rocky in much the same way he did at trial.[30]  There,

counsel challenged Newland and Russell to explain how they had failed to

identify Rocky in the line-up but were nonetheless able to identify him a few

months later during the pre-trial hearing.  In so doing, counsel established that

neither witness remembered the assailant had a scar over his left eye; that Russell

never looked the assailant directly in the face; that the men only observed the

assailant for a short period of time; and that both men saw the article in the Ada

newspaper featuring a photograph of Rocky next to the composite image created

by Pratt.

Nothing, however, indicated that when Newland and Russell observed the

assailant, their views were obstructed or impeded by poor lighting.  Nor was there

indication that they were distracted and looking elsewhere when the assailant

entered the flea market office.  Similarly, both men provided descriptions of the

assailant that were relatively consistent with one another and matched other

evidence presented at trial regarding Rocky's general appearance around the time

of the flea market crimes.  Likewise, when Newland and Russell identified Rocky

---

[30]During Rocky's preliminary hearing, defense counsel rigorously cross-examined Newland and Russell as to the reliability of their identification of Rocky, highlighting their failure to identify him in the line-up, their inattention to his scar, and their viewing of the Ada newspaper articles. *See generally*, Prelim. Hearing, April 10, 1989, at 16-64.  Despite this testimony, the trial court determined there was probable cause to believe Rocky committed the crimes charged against him. *Id.* at 284.

at trial, neither man expressed hesitation that Rocky was the man they saw at the

flea market on December 8. Finally, the time between the men's observation of

the assailant and their subsequent identifications of Rocky was not so attenuated

as to undermine the reliability of their identifications. *See Archuleta*, 864 F.2d at

712 (listing cases indicating that identifications occurring anywhere from two

days up to a year after the crime were reliable). S*ee also generally Neil*, 409 U.S.

at 199-200 (outlining factors to consider when determining reliability of eye

witness identifications). In light of the above, we are not convinced that even if

trial counsel had sought to suppress Newland's and Russell's identifications, he

would have been successful in doing so.[31] As the Supreme Court declared,

> [s]urely, we cannot say that under all the circumstances of this case

---

[31]The OCCA engaged in a similar analysis when considering whether presentation of the eye witness identifications without a cautionary instruction represented a substantial violation of Rocky's rights. It concluded that while Newland's and Russell's identifications of Rocky had been thoroughly challenged by trial counsel, the identifications were nonetheless reliable. *Snow v. State*, 876 P.2d 291, 295 (Okla. Crim. App. 1994).

Rocky asserts counsel was ineffective for not requesting a cautionary jury instruction regarding identification testimony. We cannot say the absence of such an instruction prejudiced Rocky. As we have repeatedly discussed, Newland and Russell were subject to rigorous cross-examination by defense counsel. Counsel's adept cross-examination made quite clear that Newland's and Russell's identifications should be approached with a healthy dose of skepticism. Weighing all the evidence, the jury was nevertheless convinced of Rocky's guilt. Rocky has not persuaded us that had the jury received a specific instruction regarding how they should weigh identification testimony, there is a reasonable probability the outcome of his trial would have been different. The state court's resolution of this issue was not unreasonable.

> there is "a very substantial likelihood of irreparable
> misidentification." Short of that point, such evidence is for the jury
> to weigh. We are content to rely upon the good sense and judgment
> of American juries, for evidence with some element of
> untrustworthiness is customary grist for the jury mill. Juries are not
> so susceptible that they cannot measure intelligently the weight of
> identification testimony that has some questionable feature.

*Manson*, 432 U.S. at 116 (quoting *Simmons*, 390 U.S. at 384). Indeed, here the jury was given the opportunity to consider the weaknesses inherent in Newland's and Russell's identifications of Rocky but nonetheless deemed the two men's identifications worthy. On this record, Rocky has not shown his counsel was ineffective under *Strickland* for failing to seek suppression of Newland's and Russell's identifications of Rocky.

### B. Failure to request a continuance

Rocky also contends his trial attorney was ineffective for failing to request a continuance after the state endorsed Campbell as a witness just two days before trial. He argues that a continuance would have enabled counsel to investigate Campbell's claims regarding Rocky's confession. In particular, he asserts the extra time afforded by a continuance would have provided counsel the opportunity to learn of the circumstances under which McNeelus secretly recorded Campbell discussing Rocky's confession, to interview Campbell to learn of the alleged coercive manner by which the police obtained her statement, and potentially to discover Campbell's statement was untrue. Rocky raised this claim on his direct

appeal, and the OCCA ruled against him, stating "[d]efense counsel thoroughly cross-examined this witness and weakened her credibility considerably. We find no error here." *Snow*, 876 P.2d at 296.

We note that in fact the state trial court granted a continuance and pushed the trial's start date back by a day when Campbell was endorsed by the state as a witness. During trial, counsel vigorously cross-examined Campbell, raising doubts as to the veracity of her testimony. Counsel also called Klift and Scofield, both of whom provided testimony that undermined Campbell's version of events. They testified Rocky was working at the Ramada Inn the night he allegedly confessed to Campbell.

Rocky suggests a further continuance would have enabled trial counsel to learn Campbell's statement was untrue. We are not persuaded. It was not until 1997 that Campbell recanted her testimony. Prior to that date, she affirmed the accuracy of her trial statements. Specifically, when appellate counsel was investigating Rocky's claims for his direct appeal, Campbell maintained that her testimony at trial was true and that no one threatened her in the course of her providing information to the police. Nothing indicates that a slightly longer continuance prior to the commencement of Rocky's trial would have enabled trial counsel to learn Campbell's testimony was allegedly coerced. The OCCA's rejection of Rocky's ineffective assistance of counsel claim on this issue was not

a contrary or unreasonable application of Supreme Court law.  *See* 28 U.S.C. §

2254(d)(1).

### C.  Failure to object to irrelevant and inadmissible evidence

At trial, the state presented a number of pieces of evidence to which

defense counsel did not object.  These included a plaster cast of a footprint found

at the scene of the crime and photographs of skid marks, a tire track, and tennis

shoes.  Rocky claims this evidence was either irrelevant or its probative value was

outweighed by the danger of unfair prejudice or confusion to the jury and should

have been excluded.

The OCCA rejected this claim on the merits.  It held that

> [t]he boot print was the same size as the appellant's; the skid marks
> and tire tracks could have been made by the Stalling's truck seen
> speeding away from the flea market.  The tennis shoes were
> photographed at the apartment where appellant had been staying and
> contradicted his statement to his girlfriend that he wore his tennis
> shoes on the day of the murder.  While none of this evidence is
> particularly strong, it does tend to make certain facts more or less
> probable than they would have been without the evidence.  Thus, the
> evidence satisfies the statutory requirement for admission.  Counsel
> did not err by failing to object to it.

*Snow*, 876 P.2d at 296 (citation omitted).  The federal district court agreed, noting

that "to the extent that the state court found the evidence satisfied the admission

requirements of Oklahoma law, this court finds the failure to object was well

within the ambit of reasonable trial strategy and does not constitute ineffective

assistance of trial counsel."  Fed. HC, rec., vol. VII, doc. 38 at 36-37.

Rocky has done nothing on appeal but present the conclusory assertion that the OCCA's adjudication of this issue was unreasonable. He has not presented sufficient argument for why counsel's failure to object to the evidence was deficient and how such alleged failure prejudiced him. Trial counsel was not ineffective for failing to object to this evidence.

### D. Failure to investigate and present other evidence that would have raised reasonable doubt as to Rocky's guilt

Rocky asserts counsel was ineffective for failing to call as additional witnesses his father, John; his uncle, Ed Snow;[32] his sister, Angelia Stanley; his cousin, Eddie Snow;[33] his cousin, Johnny Snow; Johnny Snow's common law wife, Sheila Clark; Larry Scott; Barbara Beasely; Duncan; Tripp; and Grogins.[34]

---

[32]Ed Snow's full name is Edward Lawrence Snow. Fed. HC, rec., vol. III, doc. 14, item Q.

[33]Eddie Snow's full name is Lawrence Edward Snow. Fed. HC, rec., vol. III, doc. 14, item U.

[34]As referenced above, trial counsel stated in an affidavit that he did not receive the O.S.B.I reports on Duncan and Groggins. *See supra* note 31; Fed. HC, rec., vol. III, doc. 14, item BB. In Rocky's request for state post-conviction relief, he noted this fact but, for the sake of argument, addressed the relevance and alleged impact of the evidence potentially obtained from Duncan and Grogins under both a *Brady* and *Strickland* analysis. He did essentially the same in his request for relief on appeal

The OCCA addressed the Grogins information in the context of Rocky's *Brady* claim and deemed any argument regarding Duncan procedurally barred. *Snow*, PC 97-1350 at 4, 9. The federal district court analyzed the Duncan information solely under a *Brady* rubric. As for the Grogins O.S.B.I. interview, the federal district court first noted trial counsel attested he did not receive this

(continued...)

-67-

Rocky asserts the additional testimony provided by these individuals would have provided reasonable doubt as to his guilt. He also claims counsel was ineffective for failing to present psychological evidence showing Rocky's susceptibility to manipulation by others, particularly his brother.

A few of these claims were raised on direct appeal, but a majority of them were presented to the Oklahoma courts for the first time in Rocky's petition for state post-conviction relief. The OCCA declined to address a majority of the new claims, deeming them waived under Oklahoma's Post-Conviction Procedure Act.

---

[34](...continued)
information. *Id.* at 33. The court then rejected any argument regarding the Grogins information under both a *Strickland* and *Brady* analysis. In so doing, the court concluded that under *Strickland*'s prejudice prong and *Brady*'s materiality standard, Rocky could not prevail.

These two standards are virtually identical. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) ("We find the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible . . . : The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."); *Strickland v. Washington*, 446 U.S. 668, 694, 695 (1984) ("[T]he appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (citing in part, *United States v. Agurs*, 427 U.S. 97, 104 (1976)). Because we have already rejected Rocky's *Brady* claims regarding the Grogins and Duncan information, his ineffective assistance of counsel claims have been effectively decided as well. We therefore decline to address them further.

*See* OKLA. STAT. tit. 22, §§ 1080-1089; *supra* note 26.  The federal district court

agreed with the OCCA's waiver rulings and determined the newly raised claims

were procedurally barred.  Nevertheless, the court, "assuming for purposes of

argument that [Rocky's new claims] were not procedurally barred," rejected those

claims on their merits.  Fed. HC, rec., vol. VII, doc. 38 at 32.

As with our examination of Rocky's *Brady* claims, we need not review the

district court's procedural bar ruling regarding Rocky's ineffective assistance of

counsel claims.[35]  Instead, we "may exercise . . . discretion to bypass . . .

---

[35]We have expressed concern regarding application of Oklahoma's
procedural bar to ineffective assistance of counsel claims and questioned whether
it can deemed adequate and independent to bar habeas review of claims not raised
on direct appeal.  *See English v. Cody*, 146 F.3d 1257 (10th Cir. 1998); *Brecheen
v. Reynolds*, 41 F.3d 1343 (10th Cir. 1994).  Oklahoma's procedural bar rules
indicate ineffective assistance of counsel claims must normally be brought on
direct appeal.  *See supra* note 26.  There is a provision, however, for remand to
the trial court for an additional hearing on the ineffectiveness claims.  *See* OKLA.
STAT. tit. 22, ch. 18, App. Rule. 3.11 (record may be supplemented on appeal,
and where necessary, trial court may be directed to conduct an evidentiary
hearing).  But Oklahoma rarely, if ever, remands cases for such a hearing.
*English*, 146 F.3d at 1264.  We have therefore held that

> the Oklahoma bar will apply in those limited cases meeting the
> following two conditions: trial and appellate counsel differ; and the
> ineffectiveness claim can be resolved upon the trial record alone. All
> other ineffectiveness claims are procedurally barred only if
> Oklahoma's special appellate remand rule for ineffectiveness claims
> is adequately and evenhandedly applied.

*Id.*  We have also indicated the state has the initial burden of asserting that a
petitioner has procedurally defaulted his claims under an adequate procedural
bar.  *Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999).  Once the state has
done so, "the burden to place that defense in issue shifts to the petitioner.  This

(continued...)

procedural issues and reject a habeas claim on the merits." *Cannon*, 383 F.3d at

1159 (citing *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000)). *See also*

*Smith*, 379 F.3d at 937-38; *Allen*, 368 F.2d at 1235. Because Rocky reasserts

these claims in his ineffective assistance of appellate counsel argument, we must

---

[35](...continued)
must be done, at a minimum, by specific allegations by the petitioner as to the inadequacy of the state procedure." *Id.*

In this case, Rocky had a different attorney on direct appeal than at trial. His appellate counsel, a member of the Appellate Indigent Defender office, raised several ineffective assistance of counsel claims after requesting and being granted leave to supplement the trial record. Counsel did not request an evidentiary hearing on Rocky's ineffective assistance claims but did have an investigator assist in preparing Rocky's appeal.

Rocky argues that Oklahoma's procedural bar should be deemed inadequate, thereby permitting review of his additional ineffectiveness claims. He contends that only a few defendants, himself included, were permitted during the time period of his direct appeal to supplement the trial record for their appeals. He also alleges the Appellate Indigent Defender office was understaffed and, by implication, underfunded, and hence unable to provide the type of advocacy that should be rendered in state post-conviction proceedings. Therefore, he argues, Oklahoma's procedural bar should not apply to his ineffectiveness claims.

While we harbor continuing concerns regarding Oklahoma's procedural bar to claims regarding the ineffectiveness of counsel, we are not convinced by Rocky's argument in this specific case. His direct appeal attorney was able to expand the record, use an investigator, and raise a number of ineffectiveness claims on appeal based on that expanded record. Nor has Rocky proffered any evidence by affidavit or otherwise that his appellate counsel was limited or constrained in representing him. Appellate counsel provided an affidavit on Rocky's behalf in his post-conviction proceedings to address other issues, but she made no reference to staffing or funding cuts undermining her ability to represent Rocky. Fed. HC, rec., vol. III, doc. 14, item DD. Under the specific circumstances of this case, therefore, we are not persuaded by Rocky's procedural bar argument.

reach the merits of these issues in any event.

We acknowledge this portion of Rocky's appeal has given us pause. In the final analysis, however, whether under § 2254(d)'s highly deferential standard, or even under a *de novo* review, we are unable to conclude counsel's representation was so deficient as to cause prejudice even assuming counsel erred as Rocky alleges.

We begin with the claims that have caused us the greatest concern, focusing on the alleged testimony Ed, Johnny, and Clark subsequently claimed they were willing to give in Rocky's defense. In an affidavit prepared for Rocky's direct appeal, Ed stated:

> One night Allen came to my place and talked to me about what happened in Ada in December 1988. It was after Rocky was arrested for the stabbings in Ada, but before he went to trial. . . . Allen likes to brag about what he has done . . . .
> *Allen told me Rocky did not kill the woman in Ada. He said he did. He told me every time he stabbed her it sounded like a pig hung under a gate or like hitting a ripe watermelon.* Allen carried a knife in the headliner of his pickup. That night he went out to his pickup and got the knife out of the headliner. *He brought the knife into the house and showed me how he stabbed the woman.* Allen said all he wanted was money. The knife was like a steak knife. It did not have jagged edges.
> . . . .
> I told Barney Ward about what Allen had told me, but he just said something like, "we already got that." I would have testified if he had let me.

-71-

Fed. HC, rec., vol. III, doc. 14, item Q (emphasis added).[36] Johnny and Clark

subsequently signed affidavits for use in post-conviction proceedings stating they

would be willing to testify to similar information. They both claimed that

"[s]ometime after Rocky's trial, [they] *heard Allen say he was the one who*

*committed the murder in Ada, not Rocky*. He said the woman squealed like a pig

every time he stuck her. [They] believed Allen because [they] knew what kind of

person he is." *Id.*, item S, T (emphasis added). They also both indicated that trial

counsel was aware of the information they were willing to provide, but declined

to call them as witnesses at trial. Johnny's affidavit specifically states

> I was never asked to testify at Rocky's trial in June of 1989, but I did
> tell Rocky's attorney, Barney Ward, everything I am saying in this
> affidavit. He said he already had the information I gave him, and he
> did not want to use it because someone might get in trouble.

*Id.*, item S. Clark's affidavit largely mirrors the language appearing in Johnny's

affidavit. She stated

> I was never asked to testify at Rocky's trial in June of 1989, but
> Rocky's trial attorney, Barney Ward, was aware of everything I am
> saying in this affidavit. He said he already had the information, and
> he did not want to use it because someone might get in trouble.

---

[36]During trial, defense counsel asked Allen on cross-examination if he had
ever told his uncle that he stabbed Bush and "she squealed like a pig." Tr. at
854. Allen denied making any such statements. *Id.* Counsel did not call Ed to
testify.

*Id.*, item T.[37]

Ed's, Johnny's, and Clark's information went to the heart of Rocky's

defense: that the jury could not find Rocky committed the flea market crimes

beyond a reasonable doubt because evidence indicated his brother, Allen, was the

perpetrator instead. To advance this theory, trial counsel relied on Benson's

testimony. She testified Allen made a number of incriminating statements about

the flea market crimes. According to Benson, Allen claimed to have the knife

used in the flea market crimes; claimed to have knowledge about what it is like to

stab a person; said he threw the knife away at a local dump; and subsequently

threatened Benson when he learned she shared this information with the police.

Of course, much of Benson's testimony was called into question when she was

cross-examined by the state and further undermined by rebuttal testimony

---

[37]Johnny's affidavit also asserts that Allen asked Johnny if he would be willing to drive the Stallings truck from Ada to Hartshorne but that he declined because he had recently ceased working for Stallings. Fed. HC, rec., vol. III, doc. 14, item S. Johnny and Clark also claimed they were present at the Sportsman's bar a few nights before the Ada crimes and heard Allen offer Rocky money to drive the Stallings truck from Ada to Hartshorne. In addition, they asserted Allen attempted to implicate Johnny in the flea market crimes; that they saw Allen place a grey hooded sweatshirt and a knife into a box and leave it at his father's house in McAlester; that Allen claimed the knife was the weapon Rocky used in the flea market crimes; and that Allen threatened to kill them and their children if they testified at Rocky's trial. *Id.*, item S, T.

Curiously, Rocky's state post-conviction and federal habeas counsel focused more intently on this information than on Johnny and Clark's statement that they heard Allen say he committed the Ada crimes.

provided by her mother and Officer Hogan. Rocky contends the additional

testimony from Ed, Johnny, and Clark would have created reasonable doubt

regarding his guilt, and counsel was therefore ineffective for failing to present

them as witnesses.

Rocky's claim regarding his uncle was raised on direct appeal. Rejecting

this claim on the merits, the OCCA stated

> [h]ad [this witness] been called, [Rocky] argues, [Ed] could have
> corroborated certain defense evidence. Of course [Ed] would also
> have been subject to cross-examination. As there is no claim defense
> counsel was not aware of [this] witness[], the decision not to call
> [him] must be considered reasonable trial tactics. Reasonable trial
> tactics, even those which ultimately are not successful, are not
> grounds for finding trial counsel ineffective.

*Snow*, 876 P.2d at 296. We review the court's decision under § 2254(d)'s

deferential standard.

Rocky's claims regarding Johnny and Clark were first raised in his petition

for state post-conviction relief and were dismissed by the OCCA as procedurally

barred.[38] Because these claims were not addressed by the state court on their

_____

[38]These two claims have followed a confused procedural path. When the
OCCA addressed Rocky's state post-conviction claims, it confused Johnny Snow,
Rocky's cousin, with John Snow, Rocky's dad. As we will discuss later, Rocky
raised an ineffective assistance of counsel claim on direct appeal regarding his
attorney's failure to call his father as a witness. The OCCA rejected this claim
on the merits. *Snow*, 876 P.2d at 296. In denying Rocky relief in his state post-
conviction petition, the OCCA erroneously believed the claims raised regarding
John Snow on direct appeal were the same as the claims regarding Johnny Snow

(continued...)

merits, we review them *de novo*. *Cannon*, 259 F.3d at 1260. The differing

standards of review for Ed, Johnny, and Clark are of no matter, however. While

we have severe reservations regarding trial counsel's failure to call these three

individuals as witnesses, we nonetheless are not convinced the absence of their

testimony prejudiced Rocky.

Generally, counsel's failure to call witnesses whose testimony would be

corroborative or cumulative of evidence already presented at trial is not deemed

constitutionally deficient. *See Humphreys v. Gibson*, 261 F.3d 1016, 1021 (10th

Cir. 2001) (cumulative evidence would not have led jury to reach a different

result in sentencing phase of capital case and thus cannot provide basis for habeas

relief); *Medina v. Barnes*, 71 F.3d 363, 367 (10th Cir. 1995) (additional evidence

---

[38](...continued)
raised in the post-conviction petition. The court therefore deemed the claim
barred by *res judicata*. *Snow*, PC 97-1350 at 2, 8. The court correctly concluded
that Clark's information was identical to Johnny's but then, continuing to believe
Johnny and John were the same person, held Rocky had "not shown sufficient
reason why [his] claim [regarding Clark] was not raised by direct appeal counsel.
This information does not raise additional facts not already part of the record."
*Id.* at 9. Rocky's claim regarding Clark was thus rejected as procedurally barred.

The federal district court perpetuated this confusion by holding the OCCA
did not err in deeming these claims precluded by *res judicata* and procedural bar.
These courts' confusion is wholly understandable. As we acknowledged earlier
in this opinion, *see supra* note 1, there are numerous witnesses and affiants in
this case who are related and share very similar names. Distinguishing these
individuals, let alone distinguishing when Rocky raised his claims regarding their
varying proffered testimony or statements, is a daunting task. Nonetheless, the
claims regarding Johnny and Clark were dismissed as barred on erroneous
grounds.

was "at most cumulative, and of limited probative value" and, as such, could not provide basis for habeas relief); *United States v. Schaflander*, 743 F.2d 714, 719 (9th Cir. 1984) (trial counsel's failure to call witnesses to provide cumulative exculpatory evidence did not prejudice defendant). Unlike these cases, however, here counsel declined to present witnesses whose testimony would support the innocence of the defendant, *i.e.*, that Allen, rather than Rocky, committed the flea market crimes. Instead, as we have noted, counsel's defense theory hinged upon Benson's testimony in which she only said Allen implied that he had committed the crimes and which was significantly undermined at trial. Ed, Johnny, and Clark could have provided testimony that Allen said he had committed the flea market crimes. We are thus hard pressed to understand how counsel's failure to call these individuals as trial witnesses in addition to Benson could be construed as reasonable trial strategy.

Nonetheless, we are not convinced that "but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different." *Boyd*, 179 F.3d at 913 (citing *Strickland*, 466 U.S. at 694). Significantly, Ed's, Johnny's, and Clark's testimony could have served only as impeachment evidence against Allen. In Rocky's state petition for habeas relief, he argued that Ed's, Johnny's, and Clark's reports of Allen's statements would not constitute inadmissible hearsay because the information would not be offered

for the truth of the matter asserted but rather to impeach Allen's testimony. State

PC, Pet. July 24, 155, at 44 n.17. In essence, the testimony of these individuals

would be used to present out-of-court statements allegedly made by Allen that

were inconsistent with his testimony at trial. Oklahoma case law indicates a

witness may be impeached with relevant prior inconsistent statements. However,

only those statements that were previously "given under oath subject to the

penalty of perjury at a deposition, trial, hearing or other proceeding," OKLA.

STAT. tit. 12, § 2801(4)(a)(1), can be used as substantive evidence. *See Omalza

v. State*, 911 P.3d 286, 302 (Okla. Crim. App. 1995). Hence, even if Ed,

Johnny, and Clark did testify, their comments regarding Allen's statements could

not be used to establish that Allen in fact committed the flea market crimes.

Rather, their testimony could only be used to undermine Allen's credibility,

which was how Benson's testimony was used.

In looking at the totality of the evidence and not just the evidence helpful

to Rocky, we are not persuaded the jury would have had a reasonable doubt

regarding Rocky's guilt even if they had heard this additional testimony. *Id.* We

find it impossible to overlook the damning effects of Rocky's own confused and

wavering testimony.[39] Rocky's testimony, coupled with the identifications

---

[39]No argument was raised at any point during these proceedings that
counsel was ineffective for failing to advise Rocky of the perils of testifying on
(continued...)

provided by Newland, Russell and Holt, and with Ward and Higgenbotham's testimony regarding the timing of events on the morning of December 8, greatly undermines the defense's assertion that Allen committed the flea market crimes. On this record, we cannot conclude that had counsel presented testimony from Ed, Johnny, and Clark, "there is a reasonable probability that the result of the proceeding would have been different." *Boyd*, 179 F.3d at 913 (citing *Strickland*, 644 U.S. at 694).

Nor do any of Rocky's remaining claims provide him grounds for relief. Rocky contends counsel was ineffective in questioning his sister, Angelia Stanley, at trial. Stanley could have provided testimony that Allen had a gray hooded sweatshirt like the one the assailant was seen wearing.[40] As detailed in her affidavit presented on direct appeal, Stanley would have testified "in March 1988 . . . [she] gave [Allen] . . . a gray, hooded sweatshirt that zipped up the front. As far as [she knew] Rocky did not have a sweatshirt like that." Fed. HC, rec., vol. III, doc. 14, item R. She also claimed to have seen Allen with a gray sweatshirt during Rocky's trial. *Id.* Jones testified at trial that he saw Rocky wearing a gray

---

[39](...continued)
his own behalf.

[40]Rocky raised this claim on direct appeal, *see* Dir. App., Aplt. Br. at 87, but the state court did not explicitly address the issue. The district court noted the OCCA's failure to mention Rocky's claim regarding Stanley and then rejected the claim on the merits. Our review is *de novo*. *Cannon*, 259 F.3d at 1260.

zip-up hooded sweatshirt at the movie theater the night before the crimes, tr. at 968, and Allen and Rocky were living together at the time of the flea market crimes. *Id.* at 618. Regardless of who owned the sweatshirt, evidence was presented to the jury that Rocky was seen wearing the article of clothing prior to the crimes. Trial counsel's failure to ask Stanley about the sweatshirt was neither deficient nor prejudicial.

Rocky also claims counsel was ineffective for failing to call his father, John, to testify. Rocky asserts his father could have further explained the circumstances surrounding Allen's plans for Rocky to drive the Stallings truck from Ada to Hartshorne, commented on the confrontation at his home between Allen and Rocky on the day after the flea market crimes, and explained why he thought Allen was trying to get Rocky into trouble.[41] Coupled with his father's potential testimony, Rocky claims his cousin Eddie could have corroborated that Allen asked Rocky to drive the Stallings truck from Ada to Hartshorne and that Rocky was trying to get a job at Stallings.[42]

---

[41]John Snow's affidavit indicated he had spoken with defense counsel prior to trial and that counsel was aware of everything contained therein.

[42]In rejecting Rocky's request for state post-conviction relief, the OCCA confused Eddie Snow with Eddie's father, Ed Snow. Rocky had raised an ineffective assistance of counsel claim regarding testimony his Uncle Ed was willing to provide. The OCCA erroneously rejected Rocky's claim regarding Cousin Eddie as barred by *res judicata*, thinking it was the same claim Rocky raised on direct appeal. Our review, therefore, is *de novo*. *Cannon*, 259 F.3d at

(continued...)

-79-

Evidence regarding Rocky's alleged truck driving for Allen as well as possible strife between the brothers was established at trial. Both Rocky and Klift testified that Rocky drove the truck from Ada to Hartshorne at Allen's behest. Similarly, Klift and Miller testified to Rocky and Allen's fight at John's house. Finally, Black and Webb testified that Rocky said he was working for, or trying to get a job with, Stallings driving trucks. Of course, John's and Eddie's testimony might have provided a measure of corroboration to the other testimony proffered on Rocky's behalf. However, in light of all the other evidence presented at trial, we are not persuaded John's and Eddie's testimony create a reasonable probability that the result of Rocky's proceeding would have been different. *Boyd*, 179 F.3d at 913.

---

[42](...continued)
1260.

Eddie might also have testified that Mike Tripp told him Allen kept a knife in his truck that Allen said was used to commit the flea market crimes. Fed. HC, rec., vol. III, doc. 14, item U. As discussed below, we give little weight to Eddie's hearsay reporting of Tripp's statements, which are wholly unverified.

Investigators for Rocky's state post-conviction petition indicated they interviewed Tripp. Tripp allegedly saw Allen with the murder weapon and heard Allen say he committed the crimes at the flea market. However, the investigators were unable to get Tripp to sign an affidavit attesting to this information. Tripp also indicated he would refuse to testify at trial. In light of the unverified nature of Tripp's statements, we cannot conclude trial counsel was ineffective for failing to call him as a witness. Even if such action had been unreasonable, "[t]o affirmatively prove prejudice, [Rocky] . . . must show not only that the testimony of [an] uncalled witness[] would have been favorable, but also that [the] witness[] would have testified at trial." *Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990).

Rocky also challenges trial counsel's failure to call Scott and Beasley as witnesses. Scott owned the Zodiac Bar and stated in an affidavit that he "did not see Rocky Snow in [his] bar at any time on December 10, 1988." Fed. HC, rec., vol. III, doc. 14, item I. Beasely also worked at the bar and stated she was working on December 10 but did not remember seeing Rocky.[43] *Id.* Rocky contends the testimony of Scott and Beasely could have confirmed that he did not make a confession to Campbell at the Zodiac Bar on December 10. This information was cumulative, however. Defense counsel presented testimony from Klift and Scofield indicating Rocky worked at a banquet at the Ramada Inn during the time period Campbell claimed Rocky confessed to her. These witnesses were able to definitively state Rocky was in their company on the evening of December 10, while Scott and Beasely were only able to state that they did not remember seeing Rocky at the Zodiac Bar that day.[44] As with the other potential witnesses

_____

[43]In addressing this claim, the federal district court confused Barbara Beasely with Barbara Duncan. *See* Fed. HC, rec., vol. VII, doc. 38 at 34-35. The court refers to a Barbara Duncan in discussing whether Rocky was present at the Zodiac Bar on the evening of December 10, 1988, but the court's citation to the record makes clear it is discussing the affidavit provided by Barbara Beasely. The district court did refer to Barbara Duncan's information in addressing Rocky's *Brady* claims, which we addressed in section III of this opinion.

[44]Mary Luna's affidavit also undercuts Larry Scott's affidavit. Luna's affidavit was presented by direct appeal counsel in an effort to undermine the veracity of Campbell's trial testimony. Luna stated Campbell told her she made up the story she told to McNeelus and that in her opinion, Campbell "has never been known to tell the truth [and] is a compulsive liar." Dir. App., Aplt. Br., ex.

(continued...)

-81-

counsel did not call to testify at trial, we cannot say counsel's failure to call Scott and Beasley was so unreasonable or prejudicial to Rocky as to result in ineffective assistance of counsel.

Finally, Rocky claims counsel was ineffective for failing to present psychological evidence. He asserts counsel should have presented evidence indicating that due to mental impairments, Rocky was easily manipulated by people he trusted. Rocky asserts such evidence would have furthered his defense that Allen engineered a situation in which Rocky drove the Stallings truck from Ada to Hartshorne and therefore could be framed for the flea market crimes.

The evidence indicates that in 1979 Rocky underwent a psychiatric evaluation at Eastern State Hospital in Vinita, Oklahoma, ten years prior to the flea market crimes, where he was subject to an examination that revealed he had a verbal IQ of 73, a performance IQ of 96, and a full scale IQ of 83. According to

_____

[44](...continued)

I, doc. 3 at 2. Luna also stated that Scott told her "that on the night Sondra Campbell [was] supposed to have talked to Rocky about how he committed the two murders . . . [Scott] . . . positively remembers that when Rocky came into the bar, he went to another table and did not speak to Sondra at all." *Id.*, doc. 3 at 1. Hence, Luna's remembrance of events contradicts Scott's account.

It appears that on direct appeal, appellate counsel primarily relied on the statement in Luna's affidavit regarding Campbell being a compulsive liar. Aplt. Dir. App. Br. at 67 n.15. However, one cannot escape that when Rocky filed his direct appeal, he affirmatively relied on the information from the Luna affidavit without any qualifications, even though Luna's hearsay statement regarding Scott countered Rocky's own trial testimony that he was not at the Zodiac Bar on the evening of December 10.

the evaluation report, these scores placed Rocky "at the top of the 'borderline retardation' range of intellectual functioning." Fed. HC, rec., vol. III, doc. 14, item X. The following IQ ranges were used at the time of Rocky's trial to denominate varying levels of mental retardation: borderline mental retardation, 71-84; mild mental retardation, 50-70; moderate mental retardation, 35-50; severe mental retardation, 20-35; profound mental retardation, below 20. *See* AMER. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 31-32 (3d ed. 1987).[45] Even if counsel erred in failing to investigate Rocky's psychological history and present evidence of his borderline intellectual

---

[45]Rocky was reexamined by a licensed clinical psychologist in 1995, at which time he had been in prison for at least five years for the flea market crimes. The 1995 report indicated Rocky had suffered a number of head injuries over the course of his life, and the cumulative effect of these injuries could result in cognitive and emotional deficits greater than the sum of each individual injury. Fed. HC, rec., vol. III, doc. 14, item W. However, at least two of the head injuries listed in the report appear to have occurred after Rocky was charged and convicted of the flea market crimes.

By 1995, Rocky's IQ scores had dropped in relevant respects. He had a verbal IQ of 76, a performance IQ of 85, and a full scale IQ of 77. The report noted Rocky's "Verbal and Full Scale values are in the borderline mentally defective range with the non-verbal score in the *middle of the low average range*." *Id.* (emphasis added). Likewise "[m]easures of higher cognitive functioning found information processing speed to be borderline impaired for easy to process information and in the mild/moderately impaired range for more complex reasoning tasks." *Id.* The report concluded that Rocky's "verbal and overall abilities [were] in the borderline intellectually impaired range with non-verbal skills consistently better and in the low average range." *Id.* Even with a full scale IQ of 77, Rocky remained at the high end of the borderline mentally retarded range six years after the crime.

functioning at trial, Rocky has not shown that any such error prejudiced him. Although he did not present psychological evidence, Rocky did present evidence that Allen manipulated him into driving the Stallings truck to Hartshorne. By his own testimony, Rocky placed himself at the Stallings yard at the time the flea market crimes were occurring. Even if Rocky was easily manipulated by his brother, any such manipulation according to Rocky resulted in him being at the Stallings yard at the time of the crimes. Therefore, evidence regarding Rocky's psychological makeup would not have further advanced his own proffered alibi. Counsel was not ineffective for failing to present this evidence.

## V

### *Ineffective Assistance of Appellate Counsel*

In light of the foregoing discussion, we need not devote much comment to Rocky's ineffective assistance of appellate counsel claim. Rocky raised this issue in the event we deemed procedurally barred the claims he failed to raise on direct appeal and therefore declined to address them on the merits. Obviously we took a different path and instead determined that none of Rocky's *Brady* or ineffective assistance of trial counsel claims have merit. Having disposed of all of Rocky's claims on the merits, there remains nothing for us to review in regard to his ineffective assistance of appellate counsel argument.

## VI

In conclusion, Rocky Dale Snow is not entitled to habeas relief pursuant to 28 U.S.C. § 2254(d) for either his *Brady* or ineffective assistance of counsel claims.  The judgment of the district court is **AFFIRMED**.