FILED
United States Court of Appeals
Tenth Circuit

October 2, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

RICKY DALE RAWLINS,

        Petitioner-Appellant,

v.

DAVID C. MILLER, Warden,

        Respondent-Appellee.

No. 08-7108
(D.C. No. 6:07-CV-00359-FHS-KEW)
(E.D. Okla.)

**ORDER DENYING CERTIFICATE OF APPEALABILITY**[*]

Before **LUCERO**, **BALDOCK**, and **MURPHY**, Circuit Judges.

After a jury trial, Ricky Dale Rawlins (Ricky) was convicted in Love

County District Court in three consolidated cases. The Oklahoma Court of

Criminal Appeals (OCCA) reversed Ricky's convictions in two of the cases and

ordered a new trial, but it affirmed his conviction for shooting with intent to kill

in the third case. Ricky then filed in the federal district court a petition for

---

[*]    After examining appellant's application for a certificate of appealability
and brief and the appellate record, this panel has determined unanimously that
oral argument would not materially assist the determination of this appeal. *See*
Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered
submitted without oral argument. This order is not binding precedent, except
under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P.
32.1 and 10th Cir. R. 32.1.

habeas corpus under 28 U.S.C. § 2254 regarding the third case. The court denied the petition, and Ricky now seeks a certificate of appealability (COA) that would allow him to appeal from that denial. *See* 28 U.S.C. § 2253(c)(1)(A). Because we conclude that Ricky has failed to make "a substantial showing of the denial of a constitutional right," *id.* § 2253(c)(2), we **deny** his request for a COA and **dismiss** the appeal.

## I. Background

The parties are familiar with the facts, so we set out only those most relevant to the present matter. Because Ricky challenges the sufficiency of the evidence against him, we view the evidence in the light most favorable to the prosecution, *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979), but we also point out Ricky's contrary view of certain facts pertinent to the issues.

On Wednesday, April 16, 2003, Mike Ayres drove his wife, Stacey Ayres, to the trailer house where Ricky lived with his parents so that Stacey could serve process on Ricky's brother, Kenneth Rawlins. Stacey was not certain that Kenneth lived there, but she believed he had been served there before. The Rawlins's house is in a rural section of Love County and about a mile from property owned by Mike. Mike and Ricky worked at the same tire company. Mike also knew Ricky's father, Ricky Rawlins, Sr. (Mr. Rawlins), and had seen Kenneth a couple of times.

Mike drove his truck up the Rawlins's long driveway and parked just south of a cattle guard at the entry to a large fenced yard adjacent to the house. As Stacey walked from the truck toward the house, Mr. Rawlins met her halfway across the yard and told her that Kenneth was not there. After informing Mr. Rawlins of her purpose and that she would return on the weekend, she left.

Three days later, Stacey attempted to serve Kenneth at the Rawlins's home again. This time she was accompanied by Mike and his twelve-year-old son, Jacob Ayres. All three were seated in the front seat of Stacey's extended-cab pickup truck. Like the first time, Mike parked just south of the cattle guard at the entry to the yard, facing north, toward the house. Stacey got out and halfway across the yard met Mr. Rawlins, who told her that Kenneth was not there. Mike, now standing beside the left front fender, saw someone looking out the front door that he believed was Kenneth and hollered "there he is." Aplt. App'x, Vol. 2 at 379:7. Mr. Rawlins would not accept the papers, so Stacey dropped them at his feet and said "tell him he's served." *Id.* at 298:20-21. She started to walk back toward the truck, but Mr. Rawlins followed her, complaining that she was littering his property, demanding that she pick up the papers before she left, and threatening to call the sheriff.

With the confrontation escalating in volume, Ricky came out of the house with a 12-gauge, pistol-grip shotgun. Ricky "jacked around to make sure it was loaded" and a "live cartridge hit the ground." *Id.*, Vol. 3 at 627:10-12. He

advanced slowly across the yard.  In fear for his family, Mike retrieved a handgun Stacey kept under the seat of her truck, went around the rear of the truck with the gun pointed at the ground, and yelled "they have a gun." *Id.*, Vol. 2 at 389:13. Meanwhile, Mr. Rawlins and Stacey had reached the truck on the passenger side. Mr. Rawlins, who was repeating his demand that Stacey pick up the papers, slammed shut the passenger door so that Stacey could not get in.  Mike told Jacob to lock the door, but Mr. Rawlins opened it.  Mike then forced the door shut, and Jacob was able to lock it.

With the gun still pointed toward the ground, Mike guided Stacey around the front of the truck and into the cab through the driver's door.  He threw the gun on the floor but he could not shut the door because Mr. Rawlins was standing inside of it.  Ricky now was just to the north of the cattle guard, and Mike started backing the truck slowly down the driveway with Mr. Rawlins walking along inside of the door, pushing on it with his back as if to break it off and repeating his demand that they pick up the service papers.  Mike kept telling Mr. Rawlins that they just wanted to leave.

After slowly backing in this manner for about fifty or sixty feet, Mike gave the truck a little gas to see if Mr. Rawlins would get out of the door, but Mr. Rawlins maintained his position.  Mike then backed slowly for another fifty or sixty feet, at which point he cut the wheels sharply to the left and stepped on the gas.  The maneuver displaced Mr. Rawlins from the door, and the truck came

-4-

to a stop on the grass facing southeast, pointed at an angle away from the house. Mike heard Mr. Rawlins telling Ricky to shoot. Mike shut the door, stepped on the gas, and turned south to head down the driveway. As he did so, Ricky, who had crossed over the cattle guard, fired the first of five shots, each of which contained fifteen .32 caliber pellets. The shot shattered the rear window on the driver's side of the extended cab and the front window on the passenger side. The recoil from the gun bloodied Ricky's face. At some point, Kenneth, who had been in the house the whole time, came out with a handgun and, just after Ricky began shooting, fired five shots. In all, fifteen to twenty shotgun pellets and bullets struck the left side and rear of the truck. One of the shotgun pellets hit Jacob in the head. He sustained a life-threatening injury but survived.

Ricky's version of events differs in that he testified that he got the shotgun and came out of the house only after seeing Mike come around the rear of the truck pointing Stacey's pistol at his father. He stated that he did not recognize Mike or Stacey and that he did not know that Jacob was in the truck. He claimed that his father asked Mike if he were going to run him down and Mike said he was. Ricky said that his father was thrown to the ground by the maneuver that displaced Mr. Rawlins from inside the driver's door, and that his father then scrambled away from the truck and toward some horse trailers. With the truck at a stop, Mike fired a shot at Mr. Rawlins by reaching over his left arm with his right and firing backwards out of the open truck door. That was when Ricky

-5-

began shooting. Ricky stated that he fired the first shot in the air, and that with the other shots, he was trying to shoot out the truck tires. He testified that he felt his father was in imminent danger of death and therefore he was justified in using deadly force.

Ricky and Kenneth were tried together. The jury apparently disagreed with Ricky's version of events and rejected his defense, as it convicted him of shooting with intent to kill Mike. The court sentenced him to twenty-five years' imprisonment in that case.[1]

After the OCCA affirmed the conviction, Ricky filed his § 2254 petition in federal district court. He raised seven claims, four of which he seeks to raise in this appeal: the evidence was insufficient to convict him; the admission of hearsay statements made by his father violated his Sixth Amendment right to confront the witnesses against him; certain comments by the prosecutor denied him a fair trial; and there was cumulative error. After an evidentiary hearing, at which Ricky's father testified, the district court denied relief and did not rule on his application for a COA. Ricky now seeks a COA from this court to appeal the district court's decision. For the reasons that follow, we deny his request.

---

[1] The jury also convicted Ricky of assault and battery with a deadly weapon in the cases involving Stacey and Jacob, but again, the OCCA reversed those convictions and remanded for a new trial; they are not at issue in this appeal. The OCCA also overturned Kenneth's conviction in the case involving Mike and remanded for a new trial, but affirmed his convictions in the cases involving Stacey and Jacob.

## II.  Standards of Review

Issuance of a COA is jurisdictional.  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  That is, unless the district court or this court first issues a COA, a state prisoner may not appeal from the denial of federal habeas relief.  28 U.S.C. § 2253(c)(1)(A).  Our review of Ricky's appeal is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  *See Snow v. Sirmons*, 474 F.3d 693, 696 (10th Cir. 2007).  Under AEDPA, a COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right."  *Id.* § 2253(c)(2).  To meet this standard, Ricky must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (quotations omitted).  Although Ricky need not demonstrate that his appeal will succeed to be entitled to a COA, he "must prove something more than the absence of frivolity or the existence of mere good faith." *Id.* at 338 (quotations omitted).

When the state court has adjudicated the claims on the merits, federal habeas relief is only available when the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court[,]" or "(2) resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." *McLuckie v. Abbott*, 337 F.3d 1193, 1197 (10th Cir. 2003).  "Rather, we must be convinced that the application was also objectively unreasonable."  *Id.*  "This standard does not require our abject deference, but nonetheless prohibits us from substituting our own judgment for that of the state court."  *Snow*, 474 F.3d at 696 (quotations and citation omitted).  "To the extent that the state court has not addressed the merits of a claim and the federal district court made its own determination in the first instance, this court reviews the district court's conclusions of law de novo and its findings of fact, if any, for clear error."  *Id.* at 696-97 (quotations omitted).

### III.  Discussion

#### A.  Confrontation Clause claim

Within this framework, we first address Ricky's Confrontation Clause claim.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  As he did before the OCCA and the federal district court, Ricky relies primarily on the Supreme Court's interpretation of the Confrontation Clause in *Crawford v. Washington*, 541 U.S. 36 (2004), contending

that at trial, his right to confront his father was violated (1) when Kevin McIntire, an inspector with the district attorney's office, testified that shortly after the incident, Mr. Rawlins said that Mike never pointed the gun at him but kept it at his (Mike's) side the entire time; (2) when the prosecutor read from and questioned Ricky and Kenneth at length about a written statement their father gave to authorities two days after the incident in which Mr. Rawlins did not mention anything about Mike pointing a gun at him or shooting at him; and (3) when the prosecutor used Mr. Rawlins's statements in closing argument. Ricky claims that his father's oral and written statements are hearsay, and their admission violated his Confrontation Clause rights under *Crawford* because he did not have the opportunity to cross-examine his father, who was in jail at the time awaiting his own trial in the matter and was available to testify but was never called by the State. *See id.* at 68 (holding that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination"); *id.* at 52 (explaining that "statements taken by police officers in the course of interrogations are . . . testimonial"). He also points to his father's testimony, at the § 2254 evidentiary hearing, that (1) he never told Inspector McIntire that Mike did not point a gun at him and (2) his written statement was a very broad description of what had happened rather than a comprehensive account.

The federal district court appears to have limited its review to the state-law hearsay issue, as it did not reference the Confrontation Clause or *Crawford*, but the court did determine that the OCCA's resolution of the hearsay issue was not unreasonable. *See* Aplt. App'x, Vol. 2 at 278-79. In its opinion, the OCCA did not explicitly reference the Confrontation Clause or *Crawford* either, but summarily concluded that although Mr. Rawlins's statements were hearsay, their admission did not ultimately affect the outcome of the trial, and that any error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24 (1967). In a concurring opinion, Judge Lewis succinctly opined that the admission of Mr. Rawlins's statements violated Ricky's Confrontation Clause rights under *Crawford*, but that affirmance of the conviction was proper in light of "other overwhelming evidence of guilt." Aplt. App'x, Vol. 1 at 103.

We need not determine whether to read the OCCA's opinion and Judge Lewis's concurrence together as a determination on the merits of the Confrontation Clause claim. Assuming the admission was constitutional error, it was a trial error, not a structural error. *See Crespin v. New Mexico*, 144 F.3d 641, 649 (10th Cir. 1998). And whether or not a state appellate court recognizes a constitutional trial error and makes a determination that it is harmless under *Chapman*, we review the error in habeas proceedings to determine if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quotation omitted); *see also*

*Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (holding that *Brecht* governs harmlessness determinations in habeas corpus proceedings regardless of "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*"). "[A] substantial and injurious effect exists when the court finds itself in grave doubt about the effect of the error on the jury's verdict." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006) (quotations omitted). And "[g]rave doubt exists where the issue of harmlessness is so evenly balanced that the court feels itself in virtual equipoise as to the harmlessness of the error." *Id.* at 1009-10 (quotations and alterations in original omitted). For the reasons that follow, we conclude that any error was harmless under this standard.

Under Oklahoma law, a defendant may assert defense of himself or his father (among others) as a justification for homicide "when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished[.]" Okla. Stat. Ann. tit. 21, § 733(2). The defense extends to the use of deadly force in the case of shooting with intent to kill. *See Chapple v. State*, 866 P.2d 1213, 1215 (Okla. Crim. App. 1993). But significantly, "[a]t the point where the apparent danger ceases, the right of self-defense ceases." *Mammano v. State*, 333 P.2d 602, 605 (Okla. Crim. App. 1958) (quotation omitted).

-11-

In this case, there was adequate evidence from which a reasonable jury could find that any imminent danger to Mr. Rawlins had passed by the time Ricky fired the first shot. First, there was expert testimony that a group of shotgun pellets came from a sixty-degree angle behind the driver's side of the truck and a second group struck from directly behind the truck. Further, Inspector McIntire testified that broken glass from the windows was found where the truck left the grass and reentered the driveway. This evidence tended to show that the Ayreses were in retreat when Ricky began shooting. Second, Mr. Rawlins had been thrown clear of the truck and, according to Ricky, had scrambled toward the horse trailers, away from Mike's truck. Third, Ricky's version of events was called into doubt on cross-examination through various lines of questioning, including how far Mike backed the truck before executing the maneuver that displaced Mr. Rawlins from the door and the logistics of Mike firing with his right hand over his left arm, through the open truck door and directly behind the stopped truck. Moreover, the prosecutor elicited testimony from which a rational juror could have concluded that Ricky made misrepresentations as to his assets in completing forms requesting court-appointed counsel, suggesting a general lack of candor. Fourth, Kenneth testified that when he started shooting just after his brother did, the victims were no threat to his father because they were driving away. Finally, one of the investigating agents, Gary Watson, testified that on the

-12-

night of the incident, Ricky told him he had overreacted, although Ricky denied saying this.

Despite the apparently quick pace at which the events unfolded, a rational jury could conclude that a reasonable person in Ricky's position would have determined that any danger to Mr. Rawlins had passed and that the use of deadly force was no longer justified. Thus, because Mr. Rawlins's hearsay statements that Mike never pointed the gun at him but kept it pointed at the ground concerned a matter prior in time to the cessation of the danger on which Ricky predicated his defense, its admission did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quotation omitted). That is, because the evidence supported a finding beyond a reasonable doubt that the danger had passed, whether or not Mike had pointed the gun at Mr. Rawlins became immaterial. Further, Ricky's credibility issues, outlined above, formed an independent and adequate basis to reject his allegation that Mike shot at Mr. Rawlins first. Accordingly, Ricky is not entitled to a COA on this issue.[2]

---

[2]     Even if viewed as a purely state-law evidentiary claim (i.e., that the trial court improperly admitted the hearsay statements of Mr. Rawlins), as the district court appears to have considered it, such errors only provide a basis for federal habeas relief when they amount to a denial of due process and shock the judicial conscience. *See Aycox v. Lytle*, 196 F.3d 1174, 1179-80 (10th Cir. 1999). Assuming Mr. Rawlins's statements were hearsay, their admission does not shock our conscience based on our view that ultimately they were immaterial to the outcome of the trial.

**B. Sufficiency of the evidence**

Turning to the sufficiency-of-the-evidence claim, Ricky contends that there was insufficient evidence as to two elements of the charge of shooting with intent to kill, that his acts were "intentional[] and wrongful[]" and that he had an "intent to kill any person." Okla. Stat. Ann. tit. 21, § 652(A). The OCCA summarily determined that there was sufficient evidence of all the elements of the offense. In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

> Our review under this standard is sharply limited, and a court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

*Turrentine v. Mullin*, 390 F.3d 1181, 1197 (10th Cir. 2004) (quotations and alterations omitted). We must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *United States v. Triana*, 477 F.3d 1189, 1195 (10th Cir. 2007) (quotation omitted).

The intent required for an offense under § 652(A) can be shown by circumstantial evidence. *See Carpitcher v. State*, 586 P.2d 75, 77 (Okla. Crim. App. 1978). Here, there was sufficient circumstantial evidence from which a reasonable juror could find that Ricky possessed the requisite intent. Ricky

-14-

admitted to having received basic training with an M-16 while in the Marine

Corps, suggesting that he had some familiarity with firearms. Mike and Stacey

both testified that the first shot blew out the windows, and the State's ballistics

expert testified that the windows were blown out by shotgun pellets fired from a

gun likely held between shoulder and eye level. This evidence contradicted

Ricky's testimony that he fired the first shot in the air, as did the fact that the

recoil from the first shot bloodied his face. The ballistics expert also testified

that numerous shotgun pellets struck the side panel, tailgate, bumper, and license

plate of the truck, which is adequate to support a finding that Ricky intended to

shoot Mike rather than, as he claimed, into the air or at the truck's tires. And

again, the evidence supported a finding that the Ayreses were in retreat when

Ricky began shooting and remained in retreat as he continued firing. Firing

additional shots at a retreating vehicle is a factor in determining intent from

circumstantial evidence. *See id.* For these reasons, Ricky is not entitled to a

COA on this issue.

### C. Prosecutorial misconduct

Ricky next claims that his due process rights were violated by certain

comments the prosecutor made during closing argument that inflamed the jury,

aligned the prosecution with the victims, and improperly vouched for the

credibility of witnesses. Without identifying any particular comments, the OCCA

concluded that "some misconduct occurred" but it did not "infect[] the trial with

unfairness as to make the resulting conviction a denial of due process," Aplt. App'x, Vol. 1 at 100, which is the controlling standard under *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). We have reviewed the comments and conclude that, for substantially the same reasons stated by the district court, the OCCA's resolution of this issue was not contrary to or an unreasonable application of *DeChristoforo*.

## D. Cumulative error

Ricky's final contention is that there was cumulative error. "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). Therefore, "a cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." *Id.* at 1471. An "error" means "any violation of an objective legal rule." *Id.* at 1470 n.7. Here, the only arguable violations of an objective legal rule were the trial court's admission of Mr. Rawlins's hearsay statements in violation of the Confrontation Clause and some of the prosecutor's remarks during closing argument. Given the nature of the errors as detailed above and by the district court, we conclude that even viewed collectively, the errors remain harmless.

## IV. Conclusion

For the foregoing reasons, we **deny** the request for a certificate of appealability and **dismiss** this appeal.

Entered for the Court


Michael R. Murphy
Circuit Judge